OPINION
{¶ 1} Norman D. Chester, defendant-appellant, appeals from a judgment of the Franklin County Court of Common Pleas, in which the court found him guilty, pursuant to a jury verdict, of aggravated burglary without specification, in violation of R.C. 2911.11, which is a felony of the first degree; felonious assault without specification, in violation of R.C. 2903.11, which is a felony of the second degree; two counts of kidnapping without specification, in violation of R.C. 2905.01, which are felonies of the first degree; aggravated robbery without specification, in violation of R.C. 2911.01, which is a felony of the first degree; robbery without specification, in violation of R.C. 2911.02, which is a *Page 2 
felony of the second degree; and robbery without specification, in violation of R.C. 2911.02, which is a felony of the third degree.
 {¶ 2} Appellant met the victim, Jelisa James, in a Columbus psychiatric hospital, and the two became friends. After both appellant and James were released, they started dating, and they eventually lived together. The relationship was turbulent, and James moved in with her mother, Norma Hudson. Appellant persistently telephoned James, sent her angry and threatening e-mails, and showed up at her home uninvited.
 {¶ 3} On September 19, 2006, Hudson arrived home, where appellant was waiting inside. Appellant stabbed Hudson in the face with a knife and bound her in the bedroom. Appellant told Hudson he was going to drown James and cut off James' head, and said he had already filled the bathtub with water. James eventually arrived at the home, at which point appellant threatened her with a knife. Appellant made James tie her mother to a chair in the bedroom, and then appellant made James take off all of her clothes before tying her to another chair. Appellant made Hudson use her credit cards to wire him money, and, the following morning, appellant took Hudson and James to several grocery stores and a Western Union store to retrieve money, but the money had already been transferred. Appellant had James and Hudson drop him off at a house, and James and Hudson went to the hospital and eventually contacted police.
 {¶ 4} Appellant was subsequently apprehended and questioned by police, at which time he made a statement. Appellant was indicted for aggravated burglary, felonious assault, two counts of kidnapping, aggravated robbery, and two counts of robbery. Appellant filed a motion to suppress statements made to the police, which the trial court denied after a hearing on November 27, 2007. After the motion hearing, the *Page 3 
case proceeded to a jury trial. The jury found appellant guilty on all counts as charged in the indictment but without the specifications. On December 3, 2007, for purposes of sentencing, the trial court merged the robbery counts into the aggravated robbery count, and sentenced appellant to maximum, consecutive prison sentences on the five counts, for a total sentence of 48 years. Appellant appeals the judgment of the trial court, asserting the following three assignments of error and one supplemental assignment of error, which we will refer to as his fourth assignment of error:
 [I.] THE TRIAL COURT ERRED BY REQUIRING THE DEFENDNAT TO APPEAR BEFORE THE JURY WHILE SHACKLED IN ORDER TO DELIVER HIS OWN TESTIMONY[.]
 [II] THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION TO SUPPRESS HIS ORAL STATEMENTS[.]
 [III] DEFENDANT-APPELLANT WAS NOT AFFORDED THE EFFECTIVE ASSISTANCE OF COU[N]SEL[]
 [IV] THE TRIAL COURT ERRED BY SENTENCING DEFENDANT-APPELLANT UPON COUNTS 5, 6 AND 7 WHEN THOSE COUNTS ALLEGED NO MENTAL ELEMENT.
 {¶ 5} Appellant argues in his first assignment of error that the trial court erred when it required him to appear before the jury while shackled during his testimony at trial. It is well-established that no defendant should be tried while shackled, except as a last resort.Illinois v. Allen (1970), 397 U.S. 337, 344. The presence of restraints tends to erode the presumption of innocence that the justice system attaches to every defendant. State v. Franklin, 97 Ohio St.3d 1,2002-Ohio-5304, at ¶ 79. This court has explained that the placing of restraints upon a criminal defendant during his trial may significantly affect the jury's perception of the defendant, and may thus infringe upon the presumption of *Page 4 
innocence, by stripping the defendant of the physical indicia of innocence. State v. Frazier, Hamilton App. No. C-030571, 2004-Ohio-4108, at ¶ 3. The decision as to whether to shackle a criminal defendant during the trial lies within the sound discretion of the trial court, and the record should reflect factors upon which the trial court exercised its discretion. State v. Morgan (1992), 84 Ohio App.3d 229.
 {¶ 6} However, a defendant does not have an absolute right to be free from shackles in the courtroom. State v. Blackmon (Feb. 14, 1995), Franklin App. No. 94APA05-773. In some circumstances, shackling is necessary for the safe, reasonable, and orderly progress of the trial.Morgan, at 232, citing State v. Carter (1977), 53 Ohio App.2d 125, 132. This court has noted that shackling is an "extreme measure." State v.Cunningham (July 25, 1991), Franklin App. No. 90AP-427. Notwithstanding, the Ohio Supreme Court has stated that it is widely accepted that a prisoner may be shackled where there is a danger of violence or escape.Franklin, at ¶ 79. See, also, Carter (defendant in criminal case has right to appear at trial without shackles or other physical restraint except when the trial court, in exercise of sound discretion, determines such restraint is necessary for safe and orderly progress of trial);State v. Woodards (1966), 6 Ohio St.2d 14 (prisoner may be shackled where there is danger of violence or escape).
 {¶ 7} Furthermore, because it is the responsibility of the trial court to insure that an accused receives a fair and impartial trial, it is a matter of due process that the trial court must exercise its discretion in such matters. Cunningham, supra. The trial court is in a position to consider the prisoner's actions both inside and outside the courtroom, as well as his demeanor while court is in session. Franklin, at ¶ 79. However, the trial court must actually exercise its own discretion and not simply defer to security personnel *Page 5 
without inquiring into the specific circumstances upon which officials' security concerns are based. State v. Nickelson (Sept. 27, 1994), Franklin App. No. 94APA04-582. The record should reflect factors upon which the trial court exercised its discretion. State v. Jones, Franklin App. No. 02AP-1390, 2003-Ohio-5994, at ¶ 24, citing Morgan, at 232. Where the surrounding facts and circumstances illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it. Jones, supra, at ¶ 25, citing Franklin, supra, at ¶ 82.
 {¶ 8} In the present case, at the commencement of trial, appellant's counsel had the following dialogue with the court outside the presence of the jury:
 MR. IRELAND: * * * Your Honor, if I may make a further motion as to my client. He is presently both shackled with the feet and hands. If we could have the handcuffs removed before the jury hears.
 THE COURT: Based on the advice from the sheriff's department for the protection of the attorneys, the witnesses, the Court, anyone else in the courtroom, it's necessary to have both the hands and the ankles shackled, so that is denied.
 MR. IRELAND: If I may just a moment, Your Honor, preserve the moment.
 Your Honor, having consulted further with my client, he assures me that he has no intent to harm anybody here. It's noteworthy, in fact, the alleged victims in this case are not present. I feel that the handcuffs would potentially be prejudicial for the jury to see him in the handcuffs and assume, based on that fact, he's a violent person and/or —
 THE COURT: With all the charges in this case and what I've heard, I'm not going to reconsider it. No, nothing is coming off.
 * * * *Page 6 
 THE COURT: We will take care and make sure the jury doesn't see them unless he wants them to.
 {¶ 9} As indicated above, a trial court must actually exercise its own discretion and not simply defer to security personnel without inquiring into the specific circumstances upon which officials' security concerns are based, and the record should reflect factors upon which the trial court exercised its discretion. See Nickelson and Jones, supra. Here, the trial court cited that the sheriff's department had advised it that appellant should be shackled for the protection of the attorneys, the witnesses, and the court, and the trial court explained that shackling appellant was necessary based upon the charges in the case.
 {¶ 10} However, we believe there exists a legitimate question as to whether the trial court exercised its own discretion. There was nothing in the record to indicate that appellant's demeanor in the court prompted any security concerns. The trial court also did not inquire as to the specific reasons why security personnel believed shackling was necessary. Further, the trial court provided limited reasoning as to why it found a compelling need to keep appellant shackled. Although the trial court noted that the crimes with which appellant was charged included violent crimes and the underlying facts demonstrated appellant may be capable of violent conduct, these reasons are generic and non-specific and could apply to a substantial number of defendants at trial.
 {¶ 11} Nevertheless, even if the trial court lacked the requisite independent discretion and failed to exercise the proper degree of reflection, we find any error was harmless. Shackling a defendant without exercising the required discretion is an error that does not require automatic reversal. State v. Cardinal, Franklin App. No. 05AP-992, 2006-Ohio-5088, at ¶ 33, citing State v. Adkins (May 24, 1989), Scioto App. No. 1720; *Page 7 State v. Tyree (July 15, 1994), Fulton App. No. 94FU000007. A constitutional error can be held harmless if it was harmless beyond a reasonable doubt. Id., citing State v. Conway, 108 Ohio St.3d 214,2006-Ohio-791, at ¶ 78, citing Chapman v. California (1967),386 U.S. 18, 24.
 {¶ 12} In the present case, the error was harmless on three bases. First, there is no evidence that the jury ever saw appellant wearing the shackles. The transcript of the hearing is devoid of any reference that would indicate the jury knew appellant was wearing shackles. SeeState v. Wightman, Fayette App. No. CA2006-12-045, 2008-Ohio-95, at ¶ 12 (no evidence in the record indicating that the jury could see, saw or had any knowledge of the shackles worn by appellant). The trial court also specifically indicated that it was going to make certain the jury did not see the shackles. See id. (the trial court took care to prevent the jury from seeing the shackles). In addition, contrary to appellant's suggestion, it is apparent from the trial transcript that appellant was already seated in the witness stand every time the jury entered the courtroom, and there is nothing in the record to suggest that appellant left the stand after his testimony while the jury was still in the courtroom. Therefore, it also appears that appellant never had to walk shackled to and from the witness stand in front of the jurors.
 {¶ 13} Second, as in Cardinal, in which this court found harmless error in shackling the defendant due to the defendant's admissions, in the present case, appellant's admissions made the case against him so strong, we find the error here was harmless beyond a reasonable doubt and, therefore, did not deprive appellant of due process. At trial, appellant admitted he broke Hudson's window, stabbed Hudson in the face, made James tie up her mother, tied up James, made Hudson transfer money to him, and sent *Page 8 
James threatening e-mails. Coupled with the testimony of Hudson, James, and the other state's witnesses, the evidence against appellant was overwhelming.
 {¶ 14} Third, appellant does not claim that he was unable to effectively communicate with his attorney with regard to his legal representation. The record is devoid of any suggestion that the shackles prevented appellant from conferring with his counsel with respect to his own defense. Wightman, supra, at ¶ 12 (the record did not show that the shackles inhibited defendant's ability to consult with his attorney or assist in his defense). Appellant also does not claim the restraints were an impediment to his ability to follow the proceedings and take an active interest in the presentation of his case. See State v.Leonard, 157 Ohio App.3d 653, 2004-Ohio-3323, at ¶ 46 (discussing the use of stun belts), citing United States v. Durham (C.A.11, 2002), 287 F.3d 1297, 1305-1306. Moreover, there was no evidence of any increase in anxiety that might have materially impaired and prejudicially affected appellant's ability and right to testify on his own behalf. Id. (discussing the use of stun belts), citing People v. Mar (2002), 28 Cal.4th 1201, 1224; Wightman, supra, at ¶ 12 (the record did not show that the shackles caused appellant any nervousness or other psychological distress). Therefore, we find that, even if the trial court erred in keeping appellant shackled during the trial, the error was harmless beyond a reasonable doubt.
 {¶ 15} Appellant urges us to view any error with regard to shackling as a structural error and, thus, incapable of being harmless. Structural errors are constitutional defects that defy analysis by "harmless error" standards because they affect the framework within which the trial proceeds, rather than simply being an error in the trial process itself.Arizona v. Fulminante (1991), 499 U.S. 279, 309-310. Such errors permeate the entire *Page 9 
conduct of the trial from beginning to end so that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence. Rose v. Clark (1986), 478 U.S. 570, 577-578. A structural error mandates a finding of per se prejudice. State v. Fisher,99 Ohio St.3d 127, 2003-Ohio-2761, at ¶ 9.
 {¶ 16} However, only federal constitutional errors can be structural and then only if the Supreme Court has labeled them so. See Gray v.State (Tex.Crim.App.2005), 159 S.W.3d 95, 97. The United States Supreme Court has recognized structural errors only in a very limited class of cases, including the complete denial of counsel, a biased trial judge, racial discrimination in the selection of a grand jury, the denial of self-representation at trial, the denial of a public trial, and a jury instruction that defined reasonable doubt as grave uncertainty. SeeJohnson v. United States (1997), 520 U.S. 461, 468-469.
 {¶ 17} Our review of case law in Ohio and other jurisdictions has failed to reveal any court that has viewed the shackling of a defendant during trial as a structural error, and appellant cites no authority. To the contrary, the United States Supreme Court has confirmed that harmless error analysis applies to the use of physical restraints on a criminal defendant at trial. See Deck v. Missouri (2005), 544 U.S. 622,635. In addition, numerous Ohio courts, including this court, have applied harmless error to such cases. See, e.g., State v. Mitchell, Williams App. No. WM-05-004, 2006-Ohio-5117, at ¶ 12; Cardinal, supra, at ¶ 34; State v. Garrett, Richland App. No. 03-CA-49, 2004-Ohio-2231, at ¶ 41; State v. Bizzell (Sept. 29, 2000), Montgomery App. No. 18055;State v. Curry (Sept. 30, 1997), Scioto App. No. 95CA2339;Tyree, supra. Other jurisdictions have also found that the use of restraints in the courtroom is not a structural error and is subject to *Page 10 
harmless error. See, e.g., Yglesias v. State (Tex.App.2008),252 S.W.3d 773, 777 (the trial court abused its discretion in ordering the defendant to be shackled during trial, but it did not commit structural error, and a harm analysis is appropriate); State v. Shoen (Minn. 1999),598 N.W.2d 370, 377 (an error involving improper restraints is not per se a structural defect affecting the framework of trial, and is thus amenable to harmless error analysis). For these reasons, we find any error in shackling a defendant during trial is not a structural error. Therefore, appellant's first assignment of error is overruled.
 {¶ 18} Appellant argues in his second assignment of error that the trial court erred in denying his motion to suppress his statements. The standard of review with respect to a motion to suppress is limited to determining whether the trial court's findings are supported by competent, credible evidence. State v. Winand (1996),116 Ohio App.3d 286, 288. This is a highly deferential standard of review because, in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses. State v. Hopfer
(1996), 112 Ohio App.3d 521, 548, citing State v. Venham (1994),96 Ohio App.3d 649, 653. If there is competent and credible evidence supporting the trial court's findings, the reviewing court must independently determine as a matter of law whether the trial court met the applicable legal standard or standards. State v. Williams (1993),86 Ohio App.3d 37, 41.
 {¶ 19} In the present case, appellant argues that the trial court should have suppressed his statement to police because his waiver of his rights pursuant to Miranda v. Arizona (1966), 384 U.S. 436, 479, was not knowing, voluntary, and intelligent. Pursuant to Miranda, a suspect in police custody must be warned prior to any questioning *Page 11 
that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Id.
 {¶ 20} A suspect may waive his Miranda rights, but the government has the burden of demonstrating that the waiver was knowingly and voluntarily made. Id., at 475. A proper waiver of Miranda rights is not a matter of form; rather, the question is whether the defendant knowingly and voluntarily waived his rights. State v. Scott (1980),61 Ohio St.2d 155, following North Carolina v. Butler (1979), 441 U.S. 369,373. Thus, in order to effectuate a valid waiver of one'sMiranda rights, two requirements must be met: (1) the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and (2) the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that theMiranda rights have been waived. Moran v. Burbine (1986), 475 U.S. 412,421.
 {¶ 21} To meet the first aspect of a voluntary waiver, the waiver must be non-coercive. A suspect's decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct. State v. Dailey (1990), 53 Ohio St.3d 88, paragraph two of the syllabus. The second aspect of the waiver test is whether the waiver was made with full awareness. Id. *Page 12 
 {¶ 22} Determining whether a valid waiver of Miranda rights occurred requires a consideration of the totality of the circumstances surrounding the interrogation as to whether statements were made knowingly and voluntarily, and whether defendant decided to forgo his rights to assistance of counsel and to remain silent. Fare v. MichaelC. (1979), 442 U.S. 707. Voluntariness factors to consider include: the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. State v. Twyford (2002), 94 Ohio St.3d 340, 360, citingState v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus. There must be some evidence of coercion on the part of the police in order to trigger an analysis of the totality of the circumstances. Dailey, supra, at 91-92, citing Colorado v. Connelly
(1986), 479 U.S. 157, 170. Coercive police activity is a necessary predicate to the finding that a suspect involuntarily waived hisMiranda rights and voluntarily confessed. Connelly, at 167. Absent evidence that a suspect's will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct, a suspect's decision to waive his Miranda rights and confess will be deemed to be voluntary. Culombe v. Connecticut (1961),367 U.S. 568, 602.
 {¶ 23} In the present case, appellant claims the police tactics were successful in psychologically overbearing appellant's will. Appellant claims he was reticent from the beginning of the interview, said he did not want to speak until the interviewer spoke to another detective about his prior work as an informant, stated he was not going to sign anything, continued to say "no" to the interviewer even afterMiranda warnings were *Page 13 
given, was talked out of saying "no," and requested to be read his rights again only a few minutes after they had already been read to him.
 {¶ 24} After reviewing the interview between appellant and Detective Guy Patete, we find appellant's statements to police were voluntary and knowing. Appellant began the interview by stating "[i]t don't matter to me." Then he stated:
 * * * Before I say anything, I need somebody to call Detective Dan McGahhey from homicide and let him — let him tell you what I done for him, so wherever they take me to, whatever jail they take me to, they can house me properly. Before I can say anything, I need that to happen.
 * * *
 I need somebody be aware of it for when we go to the jail. I'm not talking until that happens.
Apparently, appellant had worked as an informant for McGahhey in another case, and appellant claimed McGahhey told him that he should contact McGahhey if he were ever arrested so that precautions could be taken for his safe imprisonment.
 {¶ 25} After Patete and appellant discussed McGahhey at length, Patete then asked appellant, "[a]re you going to talk to me or not?" Appellant replied he would talk if Patete would contact McGahhey. Patete replied he would call McGahhey and tell him what was happening after they "t[ook] care of what's going on here at headquarters[,] * * * [b]ut right now I'm not going to do anything because I want to figure out — I want to hear your side of what's going on here."
 {¶ 26} At this point, Patete told appellant he was going to read him his rights, and then stated, "[y]ou can answer questions; you cannot answer questions," to which appellant replied "I'm not signing nothing." Patete replied, "[i]t's up to you." Appellant then said again, "I'm not answering your questions. I'm not signing nothing and no tape *Page 14 
recorder, so read me my rights." Patete replied "Okay," and asked appellant to stand up. Appellant then talked about contacting McGahhey again so that appellant would not have any problems in jail. Patete again assured appellant that he would contact McGahhey after they were done. After assuring appellant it was not a problem to contact McGahhey, Patete stated, "[a]ll right. All right. This is a constitutional rights waiver I'm going to read to you, okay? I'm going to get a little background here from you real quick." Patete then asked appellant a few questions regarding his ability to read and write, whether he was under the influence of any drugs or alcohol, and whether he had any impairments before reading the constitutional rights waiver form to appellant. After Patete read appellant his rights, appellant replied that he had read and been read his rights, he understood his rights, he did not want a lawyer at that time, he was willing to answer questions, he knew what he was doing, no promises or threats had been made, and no pressure had been used against him. Appellant then signed the waiver of rights form.
 {¶ 27} At the hearing on the motion to suppress, Patete testified that he did not threaten or coerce appellant in any way during the interview. Patete stated that appellant never indicated during the course of the interview that he wanted to stop talking or obtain a lawyer.
 {¶ 28} The first three-quarters of the interview consisted mostly of appellant's pleas for Patete to contact McGahhey. At no point during this period did appellant seek to stop the interview or request an attorney. To the contrary, as indicated above, appellant specifically stated that he would speak with Patete if Patete would agree to contact McGahhey. Patete agreed to contact McGahhey after he and appellant were finished talking. When Patete brought up the waiver of rights form, appellant stated he would not *Page 15 
sign anything and he would not answer his questions. Thus, this appears to be the critical point of the interview for determining the voluntariness of the statement.
 {¶ 29} Immediately after telling Patete that he would not sign anything and would not answer his questions, appellant stated "so read me my rights." Initially, we note that, contrary to appellant's claims upon appeal, appellant had not yet been read his rights prior to his statement "so read me my rights." Notwithstanding, a plain reading of the conversation suggests that appellant requested to have his rights read to him, and he subsequently waived them after being so informed. At no time after Patete informed appellant of his rights did he explicitly ask to stop the interview or request an attorney. Although appellant did say he was not going to answer any of Patete's questions, it appears that appellant's statements in this respect were based on his desire for Patete to first speak to McGahhey. After Patete reassured appellant that he would speak to McGahhey, appellant signed the waiver of rights. Patete's assurances, in this regard, were not coercive. An investigator's offer to help if a defendant confesses is not improper.State v. Chase (1978), 55 Ohio St.2d 237. Furthermore, after stating he was not going to answer anymore questions, it appears from the transcript that appellant was the one who initiated further conversation with Patete, telling the detective that he was not going to run away from the situation and that he wanted to get it resolved. It was after appellant made these statements that Patete assured appellant he would contact McGahhey, and appellant waived his Miranda rights. The transcript reveals no hesitation or reluctance on behalf of appellant during the reading of his rights or his signing of the waiver form. There is nothing in the record to suggest that the wavier was anything other than appellant's free and deliberate choice. *Page 16 
 {¶ 30} In addition, the other circumstances surrounding appellant's statements do not reveal any of the indicators of involuntariness enunciated in Edwards, supra. Appellant's age did not impact his statement, he had a college degree, he had prior criminal experiences, the interview at issue was no more than one hour, Patete noted that appellant had been cooperative, there is no indication in the transcript that the interview was unusually combative or intense, there was no evidence of physical deprivation or mistreatment, and Patete never threatened appellant. Also important is that, contrary to appellant's claims herein, there is no evidence in the record that he continued to say "no" to Patete after Miranda warnings were given.
 {¶ 31} Accordingly, we find the state satisfied its burden to demonstrate appellant's statement was voluntary and knowing. Lacking evidence that appellant's will was overborne and his capacity for self-determination was impaired because of any coercive police conduct, we find appellant's decision to waive his Miranda rights was voluntary. Appellant's second assignment of error is overruled.
 {¶ 32} Appellant argues in his third assignment of error that he was denied effective assistance of counsel. The Sixth Amendment to the United States Constitution guarantees a criminal defendant the effective assistance of counsel. McMann v. Richardson (1970), 397 U.S. 759, 771. Courts employ a two-step process to determine whether the right to effective assistance of counsel has been violated. Strickland v.Washington (1984), 466 U.S. 668, 687. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced *Page 17 
the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id.
 {¶ 33} An attorney properly licensed in Ohio is presumed competent.State v. Lott (1990), 51 Ohio St.3d 160, 174. The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy. State v. Smith (1985), 17 Ohio St.3d 98, 100. In demonstrating prejudice, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. State v. Bradley (1989),42 Ohio St.3d 136, paragraph three of the syllabus.
 {¶ 34} In the present case, appellant argues his counsel was ineffective in three aspects: (1) his attorney failed to further move to redact the prejudicial portions of the videotape of appellant's interrogation; (2) his attorney allowed appellant's criminal record to be used on cross-examination for impeachment purposes; and (3) his attorney failed to aggressively cross-examine the alleged victims. With regard to appellant's first contention, appellant asserts that, although his counsel made a motion to redact prejudicial portions of the videotape during the motion to suppress hearing, he failed to renew the motion when the tape was played at trial, thereby subjecting the jury to appellant's "personality traits" that were prejudicial.
 {¶ 35} We first note that, in order to find appellant's counsel was ineffective, we must find that counsel's actions were prejudicial. However, appellant has failed to indicate how his "personality traits" were prejudicial and fails to describe these traits. At the motion to suppress hearing, appellant's counsel argued that the tape included several minutes of "rambling" and "peculiarity," although he also does not specify the precise nature of these *Page 18 
claims. We do not have a copy of the videotape before us for review. Thus, adjudging any prejudicial impact from the vantage of this appellate court is not possible. Our review of the transcript of the interview fails to illuminate with any certainty to which "personality traits" appellant refers.
 {¶ 36} Notwithstanding, it is true that a court may permissibly exclude evidence when its probative value is substantially outweighed by the danger of unfair prejudice. See Evid. R. 403(A). However, it has been held that it would be the rare case in which an accused's own actions, language or overall demeanor and appearance would be unfairly prejudicial. State v. Geasley (1993), 85 Ohio App.3d 360, 373 (trial court erred in excluding the videotape on the basis of relevancy and unfair prejudice to defendant). Here, although appellant's demeanor in the police interview may have been unfavorable to him, "[t]here is a difference between being unfavorable to the defendant and being prejudicial." Id. Therefore, for these reasons, we find appellant has failed to demonstrate his trial counsel's performance was deficient or that he was prejudiced by his counsel's actions in this respect.
 {¶ 37} Appellant also argues that his attorney was ineffective when he allowed appellant's criminal record to be used on cross-examination of appellant for impeachment purposes instead of raising appellant's record on direct examination to lessen the negative impact. However, we fail to find appellant's counsel was ineffective in this respect for two reasons. Although appellant claims that there is never a reason not to raise a defendant's criminal record on direct examination, the state points out one very reasonable trial strategy for waiting for the state to raise it on cross-examination: the defendant has to testify about it only one time, and the jury is able to hear about it only *Page 19 
one time. In addition, appellant must show that the outcome of his trial would probably have been different if not for the alleged errors by trial counsel. Strickland, supra, at 694. Appellant has failed to demonstrate, or even assert, that the outcome of the trial would have been different if his criminal record would have been raised on direct examination rather than on cross-examination, and we cannot presume that it would have been. For these reasons, we find appellant's trial counsel was not ineffective in this respect.
 {¶ 38} Appellant further argues that his attorney was ineffective when he failed to aggressively cross-examine the alleged victims. However, appellant's argument, in this respect, is comprised only of this single conclusory assertion without any further explanation of any error. Appellant's failure to provide any substantive argument in support of his position is exceedingly detrimental to his proposition. Notwithstanding, our review of the record fails to reveal ineffectiveness. Although the victims were cross-examined for ten and sixty-three transcript pages each, effectiveness of cross-examination cannot be judged by the length of cross-examination. State v.Robinson, Lucas App. No. L-06-1182, 2008-Ohio-3498, at ¶ 223 (the argument that the effectiveness of cross-examination should be judged by the number of transcript pages that the cross-examination consumes is one that simply cannot succeed). Importantly, the extent and scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not constitute a lack of effective assistance of counsel. State v. Dixon, 101 Ohio St.3d 328, 2004-Ohio-1585, at ¶ 54; see, also, State v. Downard, Wood App. No. WD-05-086, 2007-Ohio-2144, at ¶ 56 (the length of counsel's various cross-examinations is within the realm of trial strategy and not for the appellate court to second-guess). Without any further detail of the precise nature of appellant's complaint, we cannot find his *Page 20 
trial counsel was ineffective in his cross-examination of the victims. Therefore, appellant's third assignment of error is overruled.
 {¶ 39} In his fourth assignment of error, appellant asserts that the trial court erred by sentencing him upon Counts 5, 6, and 7, when those counts alleged no mental element, relying upon State v. Colon,118 Ohio St.3d 26, 2008-Ohio-1624 ("Colon I"). In Count 5 of the indictment, appellant was charged with aggravated robbery in violation of R.C. 2911.01(A)(1) and/or (3):
 * * * in attempting or committing a theft offense as defined in section 2913.01 of the Ohio Revised Code, in respect to Norma Hudson, or in fleeing immediately after the attempt or offense did have a deadly weapon, to wit: a knife and/or firearm, on or about his person or under his control, and did display the weapon, and/or did brandish the weapon, and/or did indicate that Norman David Chester did possess the weapon, and/or did use the weapon, and/or inflict or attempt to inflict serious physical harm to Norma Hudson[.]
In Count 6 of the indictment, appellant was charged with robbery in violation of R.C. 2911.02(A)(1) and/or (2):
 * * * in attempting or committing a theft offense in respect to Norma Hudson, or in fleeing immediately after the attempt or offense, did have a deadly weapon on or about his person or under his control, and/or inflict, attempt to inflict, or threaten to inflict physical harm on another, to wit: Norma Hudson and/or Jelisa James[.]
In Count 7 of the indictment, appellant was charged with robbery without specification in violation of R.C. 2911.02(A)(3):
 * * * in attempting or committing a theft offense in respect to Norma Hudson, or in fleeing immediately after the attempt or offense, did use or threaten the immediate use of force against another, to wit: Norma Hudson and/or Jelisa James. *Page 21 
 {¶ 40} Here, appellant failed to raise the mens rea issue at trial. InColon I, the Ohio Supreme Court found that "[w]hen an indictment fails to charge a mens rea element of a crime and the defendant fails to raise that defect in the trial court, the defendant has not waived the defect in the indictment." Id., at syllabus. Thus, we must determine whether the indictments failed to charge a mens rea element of the crimes at issue. In Colon I, the appellant was charged with robbery, in violation of R.C. 2911.02(A)(2). His indictment stated that appellant "in attempting or committing a theft offense, as defined in Section 2913.01
of the Revised Code, or in fleeing immediately after the attempt or offense upon [the victim, the defendant did] inflict, attempt to inflict, or threaten to inflict physical harm on [the victim]." Id., at ¶ 2. The court in Colon I found that the indictment failed to contain a mens rea for the second element of the statutory offense, i.e., "inflict, attempt to inflict, or threaten to inflict physical harm on another." R.C. 2911.02(A)(2). The court found that, because the statute did not specifically state that it was a strict-liability offense, recklessness was the catchall mens rea. Consequently, the court reasoned that, since the "recklessness" mens rea was missing from the indictment, appellant was not properly informed of the charge so that he could put forth his defense. The court further held that, because the omission violated appellant's constitutional rights to notice and due process, it permeated the entire criminal proceeding and was structural error. The court reversed the conviction.
 {¶ 41} On reconsideration, the Ohio Supreme Court declared thatColon I was prospective, and applied only to those cases pending on the date Colon I was announced. See State v. Colon, 119 Ohio St.3d 204,2008-Ohio-3749, at ¶ 5 ("Colon II"). The court also stated that the facts that led to its opinion in Colon I were "unique," noting *Page 22 
that there was no evidence in that case to show that the defendant had notice that recklessness was an element of the crime of robbery, there was no evidence that the state argued that the defendant's conduct was reckless, the trial court did not include recklessness as an element of the crime in the jury instructions, and, during closing argument, the state treated robbery as a strict-liability offense. The court inColon II then concluded that the structural error analysis for defective indictments is "appropriate only in rare cases * * * in which multiple errors at the trial follow the defective indictment." Id., at ¶ 8. The court explained that, "[s]eldom will a defective indictment have this effect, and therefore, in most defective indictment cases, the court may analyze the error pursuant to Crim. R. 52(B) plain-error analysis. Consistent with our discussion herein, we emphasize that the syllabus inColon I is confined to the facts in that case." Id.
 {¶ 42} We will first address appellant's conviction for aggravated robbery, pursuant to R.C. 2911.01(A)(1) and/or (3), included in Count 5 of the indictment. In State v. Hill, Franklin App. No. 07AP-889,2008-Ohio-4257, we recently held that Colon I does not require reversal of a defendant's aggravated robbery conviction when the indictment fails to charge a mens rea element. We noted that, in Colon II, the court stated that it assumed that the facts that led to its opinion inColon I were "unique," and it emphasized that the syllabus in ColonI was confined to the facts in that case. Hill, at ¶ 34. We also noted that, in reaching its holding in Colon I, the Ohio Supreme Court construed division (A)(2) of robbery under R.C. 2911.02, not aggravated robbery under R.C. 2911.01. Id. In Hill, we explained that, as an intermediate appellate court, we were reluctant to expansively construe the holding in Colon I to include statutes not considered by ColonI, especially since Colon II emphasized that the syllabus in ColonI is confined to the facts in that case. *Page 23 
Id. We also cited our decision in State v. Ferguson, Franklin App. No. 07AP-640, 2008-Ohio-3827, in which this court rejected the application of Colon I to the crime of aggravated robbery under R.C. 2911.01(A). Following the reasoning in Hill and Ferguson, we therefore conclude that, in the present case, appellant's aggravated robbery conviction under R.C. 2911.01(A)(1) and/or (3) is unaffected by the holding inColon I.
 {¶ 43} With regard to the charge of robbery under R.C. 2911.02(A)(1) and/or (2), we addressed this same issue in Ferguson. In both the present case and in Ferguson, the defendants were indicted for robbery, pursuant to R.C. 2911.02(A)(2), which is the same provision at issue inColon I, and the indictments did not charge the recklessness element. However, Ferguson, like the present case and unlike Colon I, also alternatively charged the defendant with robbery under R.C. 2911.02(A)(1), i.e., that the defendant, in attempting or committing a theft offense, did have a deadly weapon on or about his person or under his control. Further, like the present case, the trial court inFerguson gave a robbery instruction which encompassed the provisions of both R.C. 2911.02(A)(1) and (2). Relying upon State v. Wharf (1999),86 Ohio St.3d 375, we found in Ferguson that a violation of R.C. 2911.02(A)(1) is a strict liability offense, and a reckless mens rea is not required, unlike an offense under R.C. 2911.02(A)(2). Therefore, we concluded that, because the Ohio Supreme Court determined that R.C. 2911.02(A)(1) is a strict liability offense, and that the deadly weapon element does not require the mens rea of recklessness, the provisions of that section of the robbery statute are unaffected by the holding in theColon cases. In the present case, there was overwhelming evidence for the jury to find appellant violated R.C. 2911.02(A)(1) by having a knife on or about his person or under his control during his commission of a theft offense. Accordingly, because *Page 24 
appellant's conviction under R.C. 2911.02(A)(1) did not require the mens rea of recklessness, we do not find that the Colon cases mandate reversal of appellant's conviction for robbery under that section.
 {¶ 44} As to Count 7 of the indictment, appellant was indicted for robbery in violation of R.C. 2911.02(A)(3). Like R.C. 2911.02(A)(2), which the court addressed in Colon I, the indictment here failed to contain a mens rea for the "force" element of the statutory offense under R.C. 2911.02(A)(3). Just as the Supreme Court explained inColon I, with regard to R.C. 2911.02(A)(2) and the "physical harm" element, R.C. 2911.02(A)(3) does not contain a particular degree of culpability for the act of "force," and the statute does not plainly indicate that strict liability is the mental standard. See Colon I, at ¶ 14. Thus, "recklessness" is the "catchall" culpable mental state for the act of "force" under R.C. 2911.02(A)(3) because that section fails to mention any degree of culpability. See Colon I, at ¶ 13, citingState v. Lozier, 101 Ohio St.3d 161, 2004-Ohio-732, at ¶ 21
(recklessness is the catchall culpable mental state for criminal statutes that fail to mention any degree of culpability, except for strict liability statutes). Here, similar to Colon I, because the indictment failed to charge that the force was recklessly inflicted, it omitted one of the essential elements of the crime of robbery and, thus, was defective. Consequently, pursuant to Colon I, because the mens rea "reckless" was missing from the indictment, appellant was not "properly informed of the charge so that he could put forth his defense." Id., at ¶ 28. Furthermore, the state failed to argue during the proceeding that the "reckless" mens rea applied, the jury instructions did not include "reckless" as the required mens rea, and the prosecutor treated robbery as a strict liability offense during closing arguments, thus mimicking the "unique" facts in Colon I. Because *Page 25 
R.C. 2911.02(A)(2) and (3) are identical for purposes of the ColonI analysis, and the present case contains the same "unique" facts that were present in Colon I, we must treat these similarly situated defendants the same and find the defective indictment here resulted in structural error. Therefore, as directed by Colon I, appellant's robbery conviction under R.C. 2911.02(A)(3), as set forth in Count 7 of the indictment, must be reversed. We sustain in part and overrule in part appellant's fourth assignment of error.
 {¶ 45} Accordingly, appellant's first, second, and third assignments of error are overruled, appellant's fourth assignment of error is sustained in part and overruled in part, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings, consistent with this opinion.
Judgment affirmed in part and reversed in part; cause remanded.
KLATT and KLINE, JJ., concur.
KLINE, J., of the Fourth Appellate District, sitting by assignment in the Tenth Appellate District. *Page 1