JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, James Dzelajlija, appeals from the judgment of the common pleas court, rendered after a jury verdict, finding him guilty of robbery and sentencing him to seven years in prison. Because the trial court admitted inadmissible and prejudicial evidence, we reverse for a new trial.
 {¶ 2} Before closing the store on September 30, 2005, William Bond, assistant store manager at Elgin Furniture, prepared the daily deposit. After counting $1,570.10 in cash and checks totaling $1,874.12, he put the cash, checks, and a deposit slip in a deposit bag. At approximately 9 p.m., he locked the door to *Page 3 
the store and he, Jennifer Martin, a receptionist/cashier at Elgin, and Rosa Cole, a salesperson, walked to their respective cars.
 {¶ 3} Bond got in his car and drove across the street to National City Bank to drop the deposit bag into the after-hours depository. He did not see any other individuals or cars in the parking lot. He pulled his car next to the deposit drawer and got out of his car, carrying the deposit bag in one hand. As he reached into his pocket to retrieve the key to the drawer, an individual wearing a ski mask came running up to him and punched him in the face, knocking him down. Bond threw the bag at the individual and told him to "take the money and get the hell out of here." The individual took the money and ran away, although Bond did not see where. Bond then drove to the North Randall police department and filed a report.
 {¶ 4} Jennifer Martin admitted at trial that she was interviewed by the police shortly after the robbery, but did not tell them until she was arrested on December 2, some two months later, that Dzelajlija had committed the robbery. Martin testified that she began working at Elgin in June 2005. At the time of the robbery, she was living with Dzelajlija and paying almost all of the bills, because he was unemployed. According to Martin, in mid-September 2005, after she had complained to Dzelajlija that Bond had not helped her at work that day, Dzelajlija told her that he should rob Bond. Martin testified that she told Dzelajlija that was not a good idea, and did not take his comment seriously. *Page 4 
 {¶ 5} Martin testified further that Dzelajlija's friend Robert Jones came to the store the night of the robbery and told her that her that "he was doing it tonight, he's at the studio, don't worry," but she did not know what this meant. The "studio" was the nickname for Jones' basement, which contained a keyboard, computer and microphone.
 {¶ 6} Martin testified that when she got home from work, she saw Jones and Dzelajlija getting out of Jones' truck. She asked Dzelajlija "if he did what I thought he could have done," but Dzelajlija said, "[n]o, there was a cop car in the parking lot."
 {¶ 7} According to Martin, when they got in the apartment, however, Dzelajlija threw a white envelope containing cash and a deposit slip at her and told her, "[i]f anybody asks you anything, don't say anything, you don't know anything." Martin testified that she had prepared the evening deposit at the store before, so she knew "immediately" what the envelope was. According to Martin, she and Dzelajlija used some of the money to pay their rent and buy groceries, but she did not know what the rest of the money was used for.
 {¶ 8} Martin admitted that although she told the police about Dzelajlija's involvement in the robbery after her arrest, she did not tell them about her involvement until three days later, when she gave the police a written statement. Martin was indicted by a Cuyahoga County grand jury for receipt of stolen property *Page 5 
and admitted that she hoped she would get some "consideration" from the prosecutor in exchange for her testimony.
 {¶ 9} North Randall Police Lieutenant Harry Rose, who investigated the robbery and interviewed Martin after the robbery and again after her arrest, testified at trial about his investigation. The prosecutor then asked Rose repeatedly whether Martin's story about Dzelajlija's involvement in the robbery was true:
 {¶ 10} "Q. Were there a set of-was there a set of events that you put together on your own as part of your investigation to come to the conclusion that Jennifer Martin was being truthful with you?
 {¶ 11} "A. Yes, because if she was being truthful-is that your question?
 {¶ 12} "Q. Yes.
 {¶ 13} "A. Yes. She opened up and advised me of everything that had been happening, that James had been coming there one half an hour before the store closed two or three times a week, and that he had asked her and actually told her that he was going to rob the victim, and she asked him not to do it.
 {¶ 14} "At that time, I knew that she was being truthful about it. I thought very strongly she was truthful about it.
 {¶ 15} "Q. Did you explain to Jennifer that she was in trouble as well?
 {¶ 16} "A. I told her, I said, hey, you know, subject one is-if subject one is that involved, you're involved. You can't get yourself-you can't go around it. *Page 6 
 {¶ 17} "Q. During your conversation, did that alter Jennifer's truthfulness as far as you could tell?
 {¶ 18} "A. No. She consistently stated that she had ruined her life and she should have told someone and she feel [sic] awful bad that Bill had to get beat up the way he did and she was scared and she wanted to tell somebody, but she just was confused and didn't know what to do."
 {¶ 19} After Rose testified that he had excluded Jones as a suspect in the robbery, the prosecutor again asked Rose about Martin's truthfulness:
 {¶ 20} "Q. Well, wait now. Don't you use like a test of truthfulness of sorts when you're dealing with your interviewees?
 {¶ 21} "A. Yes.
 {¶ 22} "Q. And would you say that Jennifer Martin was completely truthful with you when she first interviewed with you?"
 {¶ 23} The trial judge sustained defense counsel's objection to this question, but the prosecutor asked the question again:
 {¶ 24} "Q. Did you notice any inconsistencies between your first interview with Jennifer Martin and the second one on December 2nd?
 {¶ 25} "A. Okay. The first interview, she did not mention a boyfriend's name. In the second interview, she did mention his name and gave me his involvement in the crime. *Page 7 
 {¶ 26} "Q. So she omitted information in the first interview?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. Did you, by the time you got to the second interview, based on your experience and the interaction you had had with Jennifer, did you believe her to be truthful the second time you interviewed her?
 {¶ 29} "A. Yes, I did."
 {¶ 30} The prosecutor likewise elicited testimony from Rose about Bond's truthfulness regarding his involvement in the robbery:
 {¶ 31} "Q. Did you ever see Bill Bond for yourself when he was injured?
 {¶ 32} "A. Yes. He came in and we did an interview with him. Again, I talked to him over the phone, but we gave him the same type interview that we gave everybody at the beginning, and I wasn't sure that it was not a setup on his part. I believed that he showed me from my experience that he was being very truthful, that he was actually knocked down and beaten at the scene and he admitted that he did give the gentleman the bag because he feared for his safety."
 {¶ 33} In his fourth assignment of error, Dzelajlija contends that he was denied his constitutional right to a fair trial because the prosecutor elicited opinion testimony from Lieutenant Rose about Martin's and Bond's truthfulness. We agree.
 {¶ 34} The opinion of a witness as to whether another witness is being truthful is inadmissible. State v. Boston (1989), 46 Ohio St.3d 108,128, modified by State v. *Page 8 Dever (1992), 64 Ohio St.3d 401; State v. Eastham (1988),39 Ohio St.3d 307, 312 (Brown, J., concurring); State v. Miller (Jan. 26, 2001), 2nd Dist. No. 18102; State v. Coffman (1998),130 Ohio App.3d 467, 475.
 {¶ 35} "In our system of justice, it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." Eastham, supra at 312.
 {¶ 36} Here, there is no question that Lieutenant Rose's testimony about Martin's veracity was improper and constitutes reversible error. We are unpersuaded by the State's argument that any error on its part was harmless, because Martin testified and the jury could judge her credibility for itself.
 {¶ 37} First, the fact that the vouching witness was a police officer makes the opinion testimony even more egregious. "`Jurors are likely to perceive police officers as expert witnesses, especially when such officers are giving opinions about the present case based upon their previous experience with other cases.'" State v. Huff (2001),145 Ohio App.3d 555, 561, quoting Miller, supra.
 {¶ 38} Second, identity was the crux of this case. The only witness connecting Dzelajlija to the robbery was Martin and there was no evidence corroborating her testimony. No one saw Dzelajlija at the scene and the robber was wearing a mask. Bond did not identify him, even though he had seen him at the store previously. Robert Jones, who Martin said was also involved in the robbery, did not testify. *Page 9 
 {¶ 39} Dzelajlija's defense was that Martin was lying and that she had an incentive to lie. Rose's testimony, which offered an opinion about the truth of Martin's allegations, improperly "acted as a litmus test of the key issue in the case and infringed upon the role of the fact finder, who is charged with making determinations of veracity and credibility." Eastham, supra at 312. The testimony deprived Dzelajlija of a fair trial and, therefore, his fourth assignment of error is sustained.
 {¶ 40} Our resolution of the fourth assignment of error renders appellant's other assignments of error moot and therefore we need not consider them. See App.R. 12(A)(1)(c).
Reversed and remanded for a new trial.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
CHRISTINE T. McMONAGLE, JUDGE
 JAMES J. SWEENEY, P.J., and ANN DYKE, J., CONCUR *Page 1