[Cite as *State v. Robertson*, 2026-Ohio-1147.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                      :

    Plaintiff-Appellee,                       :             No. 24AP-184
                                               (C.P.C. No. 24CR-147)

v.                                                 :

                                                (REGULAR CALENDAR)
Justus M. Robertson,                               :

    Defendant-Appellant.                      :

_____

D E C I S I O N

Rendered on March 31, 2026

_____

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant. **Argued:** *Kort Gatterdam.*

**On brief:** *Shayla Favor*, Prosecuting Attorney, and *Benjamin A. Tracy*, for appellee. **Argued:** *Benjamin A. Tracy.*

_____

APPEAL from the Franklin County Court of Common Pleas

EDELSTEIN, J.

{¶ 1} Defendant-appellant, Justus M. Robertson, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated murder, murder, felonious assault, aggravated robbery, and improperly discharging a firearm at or into a habitation or school safety zone. For the following reasons, we affirm in part and reverse in part.

## I. Facts and Procedural History

{¶ 2} By indictment filed January 11, 2024, plaintiff-appellee, State of Ohio, charged Mr. Robertson with one count of aggravated robbery, in violation of R.C. 2911.01, a first-degree felony; one count of improperly discharging a firearm at or into a habitation

or a school safety zone, in violation of R.C. 2923.161, a second-degree felony; three counts of felonious assault, in violation of R.C. 2903.11, second-degree felonies; one count of aggravated murder, in violation of R.C. 2903.01, an unclassified felony; one count of purposeful murder, in violation of R.C. 2903.02, an unclassified felony; and one count of felony murder, in violation of R.C. 2903.02, an unclassified felony.[1]

{¶ 3} Each of the charges contained an accompanying three-year firearm specification pursuant to R.C. 2941.145(A). The charges related to the July 7, 2022 shooting death of Christopher Roberts, Jr. Mr. Robertson entered a plea of not guilty.

{¶ 4} At a jury trial beginning January 22, 2024, David Ward, a deputy with the Franklin County Sherrif's Office, testified that on July 7, 2022, law enforcement responded to a report of a shooting on Chatterton Road. When Deputy Ward arrived at the scene, first responders were attempting to resuscitate Mr. Roberts. The parties stipulated Mr. Roberts died from a gunshot wound to his abdomen.

{¶ 5} Surveillance footage from the incident showed a Hyundai sedan arrive at the Cross Key apartment complex and reverse into a parking spot. The vehicle contained four people: Donte Adams, who was Mr. Robertson's former stepfather, Xavier Colvin, Andrew Jennings, and Mr. Robertson. Once the car was parked, Mr. Adams and Mr. Colvin exited the vehicle and began walking around the parking lot of the apartment complex. A short time later, Mr. Jennings and Mr. Robertson exited the vehicle. The surveillance video shows Mr. Jennings fired his weapon in the direction of two men, one of those men returned fire, and then Mr. Robertson and Mr. Jennings both discharged their firearms. (State's Ex. H19, H21-H23; Tr. Vol. 2 at 252-53.) When the gunfire erupted, Mr. Adams and Mr. Colvin were in the parking lot of the Thirsty Zebra, a nearby establishment. A group of people then ran near the Thirsty Zebra parking lot, and both Mr. Adams and Mr. Colvin opened fire in the direction of the other men. (State's Ex. 24; Tr. Vol. 2 at 368.) Subsequent forensic testing demonstrated Mr. Colvin fired the bullet that hit and killed Mr. Roberts. (State's Ex. B; Tr. Vol. 2 at 356, 363.) Mr. Jennings and Mr. Robertson left the scene in the Hyundai, and Mr. Adams and Mr. Colvin left on foot.

---

[1] The state initially indicted Mr. Robertson and three co-defendants on March 23, 2023 related to the same incident. The January 11, 2024 indictment superseded the original indictment.

{¶ 6} All four of the men who were inside the Hyundai on July 7, 2022 testified at trial. Mr. Jennings testified for the state as part of a plea agreement for his role in the events of July 7, 2022. The plea agreement provided that, in exchange for his truthful testimony, Mr. Jennings would enter a guilty plea to the reduced charges of involuntary manslaughter with a three-year firearm specification and aggravated robbery with a jointly recommended sentence of 18 to 23 and one-half years. Before accepting the terms of the plea agreement, Mr. Jennings faced the possibility of a life sentence.

{¶ 7} Mr. Jennings testified he and Mr. Robertson were friends and occasional roommates who went to high school together. On July 7, 2022, Mr. Jennings said he and Mr. Robertson drove Mr. Robertsons's Hyundai to an apartment complex to sell marijuana. Mr. Jennings testified he and Mr. Robertson both had guns, and had approximately half a pound of marijuana. When they approached potential customers to try to make a sale, Mr. Jennings said the group of "five or so" people pulled guns on them and stole their marijuana and guns. (Tr. Vol. 2 at 228.) Mr. Jennings testified he recognized one of the individuals who robbed him as Embrace Tucker, an acquaintance from school. Mr. Jennings said he and Mr. Robertson started to drive away, and the group that had just robbed them began to fire gunshots in their direction.

{¶ 8} After being robbed, Mr. Jennings said he and Mr. Robertson drove to a house to see Mr. Adams, who had supplied them with the marijuana. Mr. Jennings said Mr. Adams has a reputation of being "[n]ot somebody to mess with." (Tr. Vol. 2 at 277.) Mr. Jennings testified that when they told Mr. Adams what happened, Mr. Adams "g[ot] upset and he basically t[old] us we ha[d] to go back and get what we lost." (Tr. Vol. 2 at 230.) He described Mr. Adams as "[m]ad, angry, not happy about the situation." (Tr. Vol. 2 at 231.) Mr. Jennings testified Mr. Robertson was "[i]n shock from what happened," and Mr. Jennings did not recall Mr. Robertson telling Mr. Adams he did not want to go back to the scene of the robbery. (Tr. Vol. 2 at 260.) Mr. Jennings said Mr. Adams specifically told them, "we were going to go get what we lost back, and that we were going to shoot." (Tr. Vol. 2 at 287-88.)

{¶ 9} Mr. Jennings said Mr. Adams got into the driver's seat of the Hyundai, Mr. Jennings sat directly behind him, Mr. Colvin was seated to the right of Mr. Jennings,

and Mr. Robertson was in the front passenger seat. According to Mr. Jennings, all four men agreed to go back to the scene of the robbery. (Tr. Vol. 2 at 260.)

{¶ 10} Mr. Jennings testified that Mr. Adams then drove the four men to the parking lot of an apartment complex where they met a man named Fred. Mr. Jennings said Mr. Adams took both his and Mr. Robertson's cell phones and gave them to Fred, though he did not take Mr. Colvin's phone. After leaving the cell phones with Fred, Mr. Adams drove the four men back to the location where he and Mr. Robertson had been robbed earlier that day. Mr. Jennings said each of the men in the car had a gun. (Tr. Vol. 2 at 236-37.)

{¶ 11} Mr. Jennings testified that Mr. Adams parked the car in the parking lot behind an apartment complex, and Mr. Adams and Mr. Colvin exited the vehicle and began walking in the direction of a nearby drive-thru. While he was alone in the car with Mr. Robertson, Mr. Jennings said he saw the people who had robbed them, so he got out of the car and "immediately" started firing his gun. (Tr. Vol. 2 at 282.) In reviewing the surveillance footage while testifying at trial, Mr. Jennings said he got out of the vehicle first and Mr. Robertson followed him. (State's Ex. H20; Tr. Vol. 2 at 252.) Mr. Jennings testified he was "running and firing" and that Mr. Robertson was "on the other side of [Mr. Jennings] doing the same thing." (Tr. Vol. 2 at 236.) Both Mr. Jennings and Mr. Robertson were wearing masks while running and shooting. (Tr. Vol. 2 at 253.) Mr. Jennings testified he heard additional gunshots, and then he and Mr. Robertson ran back to the Hyundai and drove back to the house where they had met with Mr. Adams earlier in the day. Approximately 30 minutes later, Mr. Jennings said he and Mr. Robertson found Mr. Adams and Mr. Colvin at a Dairy Queen on Noe Bixby Road.

{¶ 12} The day after the shooting, Mr. Jennings said Mr. Adams took him and Mr. Robertson to a hotel before they eventually went to Mr. Robertsons's sister's house. Mr. Jennings said Mr. Robertson's sister gave new cell phones to both of them, and then Mr. Robertson's mother drove them both to Indiana. Once in Indiana, Mr. Jennings said he and Mr. Robertson stayed at Mr. Robertsons's father's house for two and one-half months.

{¶ 13} Mr. Jennings acknowledged he provided different statements to law enforcement and the prosecutor's office when he met with them on different occasions. He

testified he initially "held some things back" because he was fearful of Mr. Adams. (Tr. Vol. 2 at 287.)

{¶ 14} Mr. Colvin also testified for the state pursuant to a plea agreement. In exchange for his testimony, Mr. Colvin entered a guilty plea to the reduced charges of involuntary manslaughter with a 3-year firearm specification and robbery with a jointly recommended sentence of 16 to 21 and one-half years.

{¶ 15} Mr. Colvin testified that on July 7, 2022, Mr. Adams called to tell him Mr. Robertson and Mr. Jennings had been robbed. Mr. Colvin said he met Mr. Adams at his house and waited for Mr. Robertson and Mr. Jennings to arrive. Mr. Colvin said Mr. Adams was "[u]pset" and told him the plan was to "[g]o receive some shit that was tooken." (Tr. Vol. 2 at 355-56.) Mr. Colvin testified he had a .45 caliber firearm with him.

{¶ 16} Mr. Colvin said Mr. Robertson and Mr. Jennings arrived at the house to pick up Mr. Adams and himself. (Tr. Vol. 2 at 356.) He said Mr. Robertson did not ask him to go back to the scene of the robbery, nor did Mr. Robertson organize the events or solicit anyone else to participate. (Tr. Vol. 2 at 378-79.) Mr. Colvin testified he was "certain" Mr. Robertson was driving the car, and the four men drove to an apartment complex to get "some more guns." (Tr. Vol. 2 at 356-57, 379-80.) He said a person named Fred gave one gun to Mr. Jennings and another gun to Mr. Adams. Additionally, Mr. Colvin said Mr. Adams, Mr. Jennings, and Mr. Robertson gave their cell phones to Fred "so it wouldn't be known where [they] were going." (Tr. Vol. 2 at 358.) Mr. Colvin testified he did not have to leave his cell phone with Fred because he had a different type of phone than the other three men.

{¶ 17} After meeting with Fred, Mr. Colvin said the four men drove to the Cross Key apartments, which was the location of the earlier robbery. Mr. Colvin testified he was not sure of the plan other than to look for the people responsible for the robbery. (Tr. Vol. 2 at 361.) When they arrived at the apartment complex, Mr. Colvin said he and Mr. Adams got out of the car and walked to the Thirsty Zebra. Mr. Colvin testified a group of men he did not know were already in the Thirsty Zebra parking lot, and the men walked away once he and Mr. Adams arrived. After the men walked away, Mr. Colvin said he heard gun shots. He testified the same group of men started running back toward him, and he started shooting at the group. Mr. Colvin said he ran across the street after firing his weapon and

went into the woods where he took apart his gun and threw it in a creek. He testified Mr. Adams also threw his gun in the creek. According to his testimony, the two men then went to a nearby Dairy Queen and Mr. Adams called for a ride to pick them up.

{¶ 18} Mr. Colvin testified that he takes responsibility for the shooting and Mr. Robertson did not tell him to shoot Mr. Roberts. (Tr. Vol. 2 at 382.) He described his role in the matter as being there to assist Mr. Adams.

{¶ 19} Mr. Adams, who was 44 years old at the time of trial, testified on behalf of the defense. He was not testifying as part of a plea agreement with the state, and he said he chose to testify in order "to come forth and really tell the truth" as part of his sobriety journey. (Tr. Vol. 3 at 510.) He entered a guilty plea to aggravated murder and is serving a sentence of 25 years to life for his role in the events of July 7, 2022.

{¶ 20} Mr. Adams described his criminal history, including prior convictions for attempted murder, felonious assault, and drug offenses, and said he had spent periods of his life incarcerated. Mr. Adams also described a history of anger management issues dating back to his youth. Mr. Adams testified he first met Mr. Robertson when Mr. Robertson was three years old and has been a part of Mr. Robertson's life ever since. He agreed he had "violent outbursts" as part of his family life when he was married to Mr. Robertson's mother. (Tr. Vol. 3 at 507.) Mr. Adams described an incident when he "forcedly shoved" 10 to 15 pills into the mouth of one of Mr. Robertson's brothers to "see if he really wanted to die." (Tr. Vol. 3 at 506.) He also said he has struggled with drug addiction and has sold drugs since he was a teenager. Mr. Adams testified he has been in "at least four or five" violent conflicts while engaged in selling drugs and said he fired a firearm at another person during those incidents. (Tr. Vol. 3 at 508-09.) He said if someone working for him has drugs stolen, the perception is "[e]ither the person who - - who says that they got took is either lying, or if somebody else took - - took it, then we got to go get it back." (Tr. Vol. 3 at 509.) If someone steals from one of the people selling drugs for him, that person "get[s] what they got coming to them," which includes "[p]ossibly [being] shot." (Tr. Vol. 3 at 509.)

{¶ 21} Turning to the events of July 7, 2022, Mr. Adams testified Mr. Robertson and Mr. Jennings were selling drugs for him. He said that on July 7, 2022, he first saw Mr. Robertson and Mr. Jennings in the morning when they paid him for a prior supply of

marijuana. He said after Mr. Robertson and Mr. Jennings paid him, he gave them more marijuana to sell. Mr. Adams said "[s]ome hours later," Mr. Robertson called him to tell him he and Mr. Jennings had been robbed. (Tr. Vol. 3 at 514.) Mr. Adams testified Mr. Robertson said "they were going to figure out a way to get [him] the money back," but Mr. Adams "told them that's not how it works and that [he] need[ed] them to come out there to [Mr. Adams] right then." (Tr. Vol. 3 at 515.) Mr. Adams said if someone robs him, "[i]t's over. It's repercussions." (Tr. Vol. 3 at 515.) Mr. Adams testified the phone call with Mr. Robertson was just a few minutes long, and he described Mr. Robertson as "scared and frantic." (Tr. Vol. 3 at 516.) He described himself as "[m]ad." (Tr. Vol. 3 at 517.)

{¶ 22} When Mr. Robertson and Mr. Jennings returned, Mr. Robertson "was so frantic at the time, I don't even think he really wanted to drive," but Mr. Adams "demanded that [Mr. Robertson] get in a car and show me." (Tr. Vol. 3 at 517.) Mr. Adams testified Mr. Robertson and Mr. Jennings were "still trying to pay [him] for the weed, but it was bigger than the money at this point." (Tr. Vol. 3 at 517.) He said Mr. Robertson and Mr. Jennings said "they didn't really want to go back out there because of the way that everything was set up out there and that they didn't feel safe going back out there." (Tr. Vol. 3 at 518.) Mr. Adams testified Mr. Robertson "told [him] specifically he did not want to go out there," but Mr. Adams said he "forced him to go out there." (Tr. Vol. 3 at 518.) He also testified he "would have flipped on" Mr. Robertson if he had refused to go back to the scene of the robbery. (Tr. Vol. 3 at 518.) During this conversation, Mr. Adams said he was "grabbing guns" and "had a[n] AK-47 that [he] threw in the back seat and a couple hand pistols." (Tr. Vol. 3 at 518.) Mr. Adams testified he "was out of [his] mind for real" and told Mr. Robertson and Mr. Jennings "[w]e never had nothing to talk about. You getting in this car right now." (Tr. Vol. 3 at 519.) He said Mr. Robertson "actually started crying for real" because "he didn't want to go." (Tr. Vol. 3 at 519.) And he said "[n]either [Mr. Robertson nor Mr. Jennings] wanted to . . . to get in the car, and I forced them to. And because I forced them to, here we sit today. And that grieves me now, looking back." (Tr. Vol. 3 at 510.)

{¶ 23} Mr. Adams testified they all got in the car at the same time and drove to another location to get another gun. At that same location, Mr. Adams said he came up with the idea to get rid of their cell phones so they could not be tracked because he "knew what [he] was going to do" would involve "violence." (Tr. Vol. 3 at 554.) He said his

memory was "kind of foggy," but he believed he was driving. (Tr. Vol. 3 at 520.) While they were driving, Mr. Adams said Mr. Robertson was silent, but he could tell from Mr. Robertson's demeanor that he was scared. (Tr. Vol. 3 at 521.) Mr. Adams said Mr. Robertson's reaction made Mr. Adams "even more mad." (Tr. Vol. 3 at 521.) He testified Mr. Jennings and Mr. Robertson told him the location of the robbery, and when they got to the apartment complex, Mr. Adams "tried to get them out of the car, and they refused." (Tr. Vol. 3 at 521). Mr. Adams said his instruction to Mr. Jennings and Mr. Robertson to get out of the car "was a command" that they did not follow. (Tr. Vol. 3 at 523-24.) Additionally, Mr. Adams said Mr. Robertson was not wearing a face mask when Mr. Adams left him in the car.

{¶ 24} When he saw a group of people near the Thirsty Zebra, Mr. Adams and Mr. Colvin got out of the car. Mr. Adams testified three people who had been near the Thirsty Zebra walked away after he and Mr. Colvin arrived. He said he did not leave Mr. Robertson "with any specific instructions to follow," and he did not have any further contact with Mr. Robertson at that location. (Tr. Vol. 3 at 523, 528.) He said Mr. Robertson did not "assist [him] in any way" once they got to the apartment complex, Mr. Robertson was not "a part of a plan or a scheme of what was going to take place," and Mr. Robertson "never even told [Mr. Adams] who it was" that had robbed him. (Tr. Vol. 3 at 524.) Mr. Adams admitted he participated in the shooting, but he testified Mr. Robertson was not "a part of that shooting with [him]" and he never told Mr. Robertson what his intent was. (Tr. Vol. 3 at 524.) Mr. Adams said Mr. Robertson communicated "the entire time" that he did not want to go. (Tr. Vol. 3 at 525.)

{¶ 25} Mr. Adams testified that after the shooting, he did not have any contact with Mr. Robertson until the next day. He described Mr. Robertson as "[s]hook up" and "[s]cared." (Tr. Vol. 3 at 527.) Mr. Adams testified he "went on the run" to Mansfield, and he did not give Mr. Robertson any instructions in the days, weeks, or months after July 7, 2022. (Tr. Vol. 3 at 528.)

{¶ 26} On cross-examination, the state played a recording of a jail phone call between Mr. Adams and Mr. Robertson's mother from the night before Mr. Adams testified. When Mr. Adams questioned whether it was his voice on the recording, the state also played, over defense counsel's objection, a portion of the tape that included a conversation

between Mr. Adams and defense counsel.  Mr. Adams agreed that he and defense counsel had a "plan," and they were "going to follow the plan" during his testimony.  (Tr. Vol. 3 at 548.)

{¶ 27}  Mr. Adams testified that he wrote a letter to the prosecutor a few months prior to trial describing the events of July 7, 2022, consistent with how he testified. Mr. Adams summarized the language in his letter as saying "they did not want to go, that they wanted to pay [him] for the weed.  And then [he] told them that's not how it goes." (Court's Ex. 3; Tr. Vol. 3 at 564.)  Mr. Adams believed that language shows he "forced" Mr. Robertson to join him in the car.  (Tr. Vol. 3 at 564-65.)  The date of the letter was August 1, 2023, and Mr. Adams testified he wrote and sent the letter prior to meeting or having any conversation with defense counsel.  (Tr. Vol. 3 at 566.)

{¶ 28}  Lastly, Mr. Robertson testified in his own defense.  Mr. Robertson, who was 20 years old at the time of trial, said Mr. Adams was his stepfather and would beat him, leaving welts and bruises on his body.  (Tr. Vol. 3 at 574.)  Throughout his childhood, Mr. Roberston said he saw Mr. Adams use drugs, handle and discharge firearms, and use a gun to hit a person who was trying to steal from him.  (Tr. Vol. 3 at 579-80.)  Mr. Robertson said he felt "a lot of fear" toward Mr. Adams and "came to realize that [Mr. Adams] was a very aggressive person."  (Tr. Vol. 3 at 580.)  He described one instance when he saw Mr. Adams "tr[y] to kill" his brother by forcing pills down his throat.  (Tr. Vol. 3 at 626.)

{¶ 29}  Regarding the events of July 7, 2022, Mr. Robertson said he and Mr. Jennings went to the house on Loretta Avenue where Mr. Adams was drinking and using pills. Mr. Robertson described the house on Loretta Avenue as the location where he went when he needed to buy more marijuana or repay his debt to Mr. Adams.  Mr. Robertson said he and Mr. Jennings left the house and went to a location near Noe Bixby Road to sell marijuana.  While he was attempting to make that sale, someone pointed a gun at Mr. Robertson's head and told him to "give him everything."  (Tr. Vol. 3 at 583.) Mr. Robertson said he complied, and one of the other men stole the gun off Mr. Robertson's lap while the rest of the crowd stole Mr. Jennings' gun and told them to leave.  (Tr. Vol. 3 at 583.)  As they drove away, Mr. Robertson said the group began to fire their weapons toward his vehicle.

{¶ 30} After the robbery, Mr. Robertson described himself as "[f]rantic," "scared," and "shook." (Tr. Vol. 3 at 584.) In addition to his immediate response, Mr. Robertson said he began to worry how Mr. Adams would react because the stolen items had belonged to him. (Tr. Vol. 3 at 584.) Mr. Robertson testified he called Mr. Adams to tell him what happened and Mr. Adams instructed him to "hurry up" and return to the house on Loretta Avenue. (Tr. Vol. 3 at 585.) Mr. Robertson described Mr. Adams as "already mad" during the phone call, and he was concerned that Mr. Adams would "get aggressive" with him. (Tr. Vol. 3 at 585.)

{¶ 31} When Mr. Robertson and Mr. Jennings arrived back at the house on Loretta Avenue, Mr. Robertson said Mr. Adams was already walking toward them with "a lot of guns." (Tr. Vol. 3 at 586.) Mr. Adams directed him to get back in the car, and when Mr. Robertson said he "didn't want to go, [Mr. Adams] like aggressively insisted like, [w]e got to go. This is what you got to do." (Tr. Vol. 3 at 586.) Mr. Robertson testified that Mr. Adams was not physically aggressive with him at that time, but he "could tell by [Mr. Adams'] actions, how he was moving, how he was grabbing guns, [Mr. Robertson] could tell that [Mr. Adams] was serious and that he was going to be aggressive." (Tr. Vol. 3 at 586.) At that point, Mr. Robertson began to get "a little more scared" for his safety. (Tr. Vol. 3 at 586-87.) Mr. Robertson said he "didn't have much an option" because he believed Mr. Adams might hurt him if he disobeyed. (Tr. Vol. 3 at 587.) He testified, "I kind of had a option, but I was too afraid to choose the other option, so I chose the easier one" and got back in the car. (Tr. Vol. 3 at 587.) Mr. Robertson also clarified that he did not fully exit the vehicle even though Mr. Adams had previously told him to get out.

{¶ 32} Mr. Robertson said Mr. Adams did not tell him where they were going or what they would do once they arrived. (Tr. Vol. 3 at 588.) Mr. Robertson also said he never asked to return to the scene of the robbery or have Mr. Adams help him retrieve the stolen goods. (Tr. Vol. 3 at 588.)

{¶ 33} Mr. Robertson testified that Mr. Adams first drove them to the Mount Vernon area where Mr. Adams got out of the car, then returned and told Mr. Robertson and Mr. Jennings to give him their cell phones. According to Mr. Robertson, Mr. Adams "looked like he had a one-track mind, like he had a mission that he was dead set on making." (Tr. Vol. 3 at 589.) Mr. Robertson testified he remained quiet and was afraid. (Tr. Vol. 3 at

590.)  Mr. Adams drove them back to the location of the robbery.  Mr. Robertson said he relayed the location to Mr. Adams, but it was not his intent to retaliate against the people who had robbed him.

{¶ 34}  Mr. Robertson said Mr. Adams told him to stay in the car once they arrived at the location of the robbery.  (Tr. Vol. 3 at 591.)  After telling Mr. Robertson to stay in the car, Mr. Adams and Mr. Colvin exited the vehicle.  Mr. Robertson testified he did not know Mr. Adams' plan by then.  Mr. Robertson said he wanted to leave but "felt like that would bring more trouble from not just [Mr. Adams], but from [Mr. Colvin]."  (Tr. Vol. 3 at 592.)  Mr. Robertson said Mr. Jennings suggested they should cover their faces so the people who robbed them would not see them and try to shoot.  (Tr. Vol. 3 at 593.)

{¶ 35}  Mr. Robertson testified that Mr. Jennings exited the vehicle when he saw the people who robbed them.  Once Mr. Jennings was out of the vehicle, Mr. Robertson heard gunfire, but he was not certain who started firing first.  Mr. Robertson testified he did not want to remain in the car while there was gunfire all around him, so he exited the vehicle after the gunfire started.  (Tr. Vol. 3 at 593.)  Mr. Robertson admitted to firing his weapon once he was out of the vehicle but reaffirmed "that wasn't [his] intention[] on going over there."  (Tr. Vol. 3 at 593.)  He testified he left the vehicle because he did not want to get shot, and said he began firing his weapon because he "didn't know if that's what [Mr. Adams] wanted [him] to do or not" and he was afraid of "not doing it and having all three of them against [him] at one time."  (Tr. Vol. 3 at 594.)  Mr. Robertson stated he only fired his weapon because the gunfire had already started and because he was "scared of what may happen to [him] if [he] didn't shoot back."  (Tr. Vol. 3 at 596.)  Mr. Robertson testified he realized once the gunfire erupted "that that's what [Mr. Adams] had wanted to happen," and he "realized that if maybe [he does not] go with what [Mr. Adams] wants to happen, [he] might either get shot or [he] might get hurt or [Mr. Adams] might try to do something to an extreme level."  (Tr. Vol. 3 at 596.)

{¶ 36}  On cross-examination, Mr. Robertson said Mr. Adams did not instruct him to shoot anyone or to fire his weapon.  (Tr. Vol. 3 at 602-03.)  Mr. Robertson testified that Mr. Adams had a gun in his hand when he got in the vehicle with Mr. Robertson and Mr. Jennings, but Mr. Adams did not point the gun at Mr. Robertson.  (Tr. Vol. 3 at 609.)  Mr. Robertson reiterated that he was scared after the robbery and "[did not] know what

[Mr. Adams] was going to do," and he was "think[ing] of the wors[t] things possible." (Tr. Vol. 3 at 610.)   Mr. Robertson testified he "really thought there was a chance that [Mr.] Adams was going to shoot [him]" if he did not go along with the group.  (Tr. Vol. 3 at 611.)   Mr. Robertson agreed he could have gotten out of the car and left the scene once Mr. Adams and Mr. Colvin exited the vehicle, but he stated:

> [Y]ou got to also understand that he does know where I live at.
> He does know my whole family. He has been around my life.
> So it's not hard for him to get back in touch with me.

(Tr. Vol. 3 at 614.)   Despite being afraid that Mr. Adams was capable of shooting him, Mr. Robertson agreed he did disobey Mr. Adams earlier when he was ordered out of the car in the parking lot behind the house on Loretta Avenue.  (Tr. Vol. 3 at 615.)

{¶ 37} Prior to deliberations, the trial court instructed the jury on the affirmative defense of duress.  Specifically, after instructing the jury on the elements of each of the offenses, the trial court stated:

> Now, we're going to move on to duress. This is the only time the defendant has the burden of proof.  We talked about that a little bit. It's different than the State's, and I'm going to go through it for you. The defendant claims that the defense of duress that he acted out of fear for his life or of great bodily harm. In order for the defendant to establish the defense of duress, he must prove all the following: [1.] he was forced to participate in an offense against his will because [2.] he honestly believed and had good reason to believe that he was in immediate or imminent danger of death or [great] bodily harm and [3.] that there was no reasonable opportunity to escape or alternative - - alternate path to take and [4.] that the defendant was not at fault in bringing about the situation. This defense of duress applies to all counts except Count Seven murder and you may not consider duress as a defense to that count. If the defendant proves all the above by a preponderance of the evidence, he's entitled to acquit[al] on the ground of duress.

(Tr. Vol. 4 at 776-77; Jury Instructions at 16-17.)   The state did not oppose the instruction. (Tr. Vol. 3 at 569-70.)

{¶ 38} During deliberations, the jury submitted a question to the trial court.   The following exchange then occurred in the presence of the jury:

> THE COURT: I brought you in. We want to answer your question, but I have a question for you also. So we're on the

record. Jury is present. Both counsel are present, and the defendant is present.

[THE STATE]: Your Honor, if I may before we begin?

THE COURT: Yes.

[THE STATE]: The parties have agreed to this procedure that we are about to do.

[DEFENSE COUNSEL]: Yes.

THE COURT: Very good. So the question was: "Does the decision of duress need to be unanimous or by a majority vote?"

And the answer that I put in writing is: "Yes. You must be unanimous on the affirmative defense of duress. The defendant must prove all the elements of duress by a preponderance of the evidence as defined in the instructions.  It cannot be established by a majority vote." So that's the answer.

So I do want to ask, and both parties have agreed to this: Have you reached unanimous verdicts on all the counts before and then moved on to duress?

(Jurors respond in the affirmative.)

THE COURT: All right. That's helpful. I'm going to let you deliberate further. Does this answer help?

(Jurors respond in the affirmative.)

THE COURT: Do you need any other instructions at this point? You can go back and work on this? Are you good to go back and work?

(Jurors respond in the affirmative.)

THE COURT: All right. Excellent. So we'll let you go back. Again, your time is kind of your own. Just let us know what you're doing. All right.

(Tr. Vol. 5 at 795-97.)

{¶ 39} Less than one hour after the trial court excused the jury to resume deliberations, the jury indicated it had reached a verdict.  The jury found Mr. Robertson guilty of all counts and their accompanying firearm specifications.  Following a February 15,

2024 sentencing hearing, the court merged the felonious assault, murder, and felony murder convictions with the aggravated murder conviction, indicated it was imposing all sentences concurrently, and sentenced Mr. Robertson to an aggregate sentence of 29 to 31 and one-half years to life in prison. Additionally, the court indicated it was imposing 3 consecutive 3-year firearm specifications. The court journalized Mr. Robertson's convictions and sentence in a February 21, 2024 judgment entry.

{¶ 40} Mr. Robertson timely appeals. After the parties submitted their merit briefs, this court requested supplemental briefing related to potential sentencing errors the state noted in its initial brief.

## II. Assignments of Error

{¶ 41} Mr. Robertson raises the following six assignments of error for our review:

> [I.] Appellant was denied his rights to a fair trial, to counsel, to present a defense, and to due process contrary to the Ohio and United States Constitutions when the trial court ordered appellant to wear leg irons throughout trial without adequate justification.
>
> [II.] Appellant was denied his rights to confront the witnesses against him and to due process contrary to the Ohio and United States Constitutions when the state was permitted to introduce irrelevant but unfairly prejudicial hearsay statements from a Google search that also constituted an improper legal opinion.
>
> [III.] Prosecutorial misconduct deprived appellant of his rights to due process and to trial by an impartial jury contrary to the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and corresponding provisions of the Ohio Constitution.
>
> [IV.] The trial court erred in asking the jury the status of their deliberations contrary to appellant's rights to a fair and impartial jury and to due process contrary to the Ohio and United States Constitutions.
>
> [V.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on insufficient evidence and which was against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

[VI.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and Section 10 and 16, Article I of the Ohio Constitution.

Additionally, Mr. Robertson raises the following supplemental assignment of error for our review:

The trial court erred in holding that three firearm specifications to be served consecutively were mandatory where R.C. 2929.14(B)(1)(G) mandates only two. The trial court also erred in imposing a tail when its intention was for the sentences to run concurrently.

## III. First Assignment of Error – Leg Restraints

{¶ 42} In his first assignment of error, Mr. Robertson argues the trial court violated his right to due process when it ordered him to wear visible leg irons throughout trial without adequate justification.

{¶ 43} "The due process guarantees embodied in the Fifth and Fourteenth Amendments to the United States Constitution forbid the use of visible shackles during trial unless their use is justified by an essential state interest, such as where there is danger of violence or escape." *State v. Black*, 2017-Ohio-3001, ¶ 7 (10th Dist.), citing *Deck v. Missouri*, 544 U.S. 622, 624 (2005); *State v. Franklin*, 2002-Ohio-5304, ¶ 79. The presence of visible shackles undermines both the presumption of innocence and the fairness of the fact-finding process. *Id.* at ¶ 7, citing *Deck* at 630; *Franklin* at ¶ 79 (the presence of restraints erodes the presumption of innocence attached to every defendant). Additionally, the use of shackles can undermine the formal dignity of judicial proceedings and can interfere with a defendant's participation in his own defense. *Id.*, citing *Deck* at 631. "Thus, no defendant should be tried while shackled, except as a last resort." *Id.*, citing *State v. Chester*, 2008-Ohio-6679, ¶ 5 (10th Dist.), citing *Illinois v. Allen*, 397 U.S. 337, 344 (1970). *See also State v. Adams*, 2004-Ohio-5845, ¶ 104 ("we have long recognized that 'no one should be tried while shackled, absent unusual circumstances' "), quoting *State v. Kidder*, 32 Ohio St.3d 279, 285 (1987).

{¶ 44} However, a criminal defendant does not have an absolute right to be free from shackles during trial. *State v. Hughes*, 2015-Ohio-151, ¶ 21 (10th Dist.), citing *Chester* at

¶ 6. The decision whether or not to shackle a defendant during trial is within the sound discretion of the trial court. *Chester* at ¶ 5, citing *State v. Morgan*, 84 Ohio App.3d 229, 232 (5th Dist. 1992). "While shackling is an extreme measure, it is widely accepted that a trial court may require a defendant to be shackled where there is a risk of violence or escape." *State v. Burks*, 2024-Ohio-17, ¶ 38 (10th Dist.), citing *Hughes* at ¶ 21, citing *Chester* at ¶ 6. Since shackling is within the discretion of the trial court, "the record should reflect the factors the trial court considered in exercising its discretion." *Id.*, citing *Hughes* at ¶ 21, citing *Chester* at ¶ 7. " ' "Where the surrounding facts and circumstances illustrate a compelling need to impose exceptional security procedures, the trial court's exercise of discretion in this regard should not be disturbed unless its actions are not supported by the evidence before it." ' " *Id.*, quoting *Hughes* at ¶ 21, quoting *Chester* at ¶ 7.

{¶ 45} The Supreme Court of Ohio "continue[s] to emphasize that prior to ordering a defendant to wear restraints, the trial court should hold a hearing on the matter." *State v. Neyland*, 2014-Ohio-1914, ¶ 92, citing *Franklin* at ¶ 82. Though the Supreme Court has noted a trial court **should** conduct a formal hearing to preserve the appellate record, it has stopped short of holding that a hearing is **required** before ordering a criminal defendant to be shackled for trial. *Id.* at ¶ 94-95, quoting *Franklin* at ¶ 82 (noting "a hearing on the necessity for restraints is not an 'absolute rule' "). *See also State v. Boone*, 2015-Ohio-2648, ¶ 17 (10th Dist.) ("there is no per se error because the trial court did not hold a hearing to address its security concerns" before requiring a defendant to be shackled for trial).

{¶ 46} Here, the record does not contain a discussion of the trial court's **initial** decision to have Mr. Robertson appear in leg irons, and there is no indication the court conducted a hearing prior to making its decision on shackling. When defense counsel called Mr. Robertson to testify, the following exchange occurred in the presence of the jury:

> THE COURT: Ladies and gentlemen, I just conferred with the lawyers and you'll see that he has leg irons on. So he is in custody on this case just because he couldn't make bail. So you're to not to consider the fact that he is in custody for any purpose whatsoever. Does that make sense to everybody?
>
> And you're in agreement with that instruction, counsel?
>
> [DEFENSE COUNSEL]: Yes, I am, Your Honor.

> [THE STATE]: And counsel, the parties, specifically agreed this was the way to address it.
>
> THE COURT: Okay. Very good.

(Tr. Vol. 3 at 570-71.) We reiterate that this exchange does not relate to the trial court's initial decision to shackle Mr. Robertson for trial, but it does reference the use of visible leg irons. All we can glean of the court's reasoning for ordering Mr. Robertson to wear leg restraints is simply that he was in custody awaiting trial because he could not post bail. There is no discussion or indication in the record that Mr. Robertson posed a security threat or risk of escape, nor does the record reveal what factors the court considered in deciding to shackle Mr. Robertson. *See*, *e.g.*, *State v. Reynolds*, 2019-Ohio-2343, ¶ 48 (10th Dist.) ("a trial court must actually exercise its own discretion and not leave the issue up to security personnel without inquiring into the specific circumstances upon which officials' security concerns are based"). Because the record does not demonstrate a compelling need to impose the exceptional security measure of shackling Mr. Robertson for trial, we find the court lacked justification for its use of restraints.

{¶ 47} Our analysis does not end with this conclusion, however, as we must determine the appropriate standard of review to apply. As this court has explained, "[t]he use of restraints in the courtroom without justification is not structural error." *Black*, 2017-Ohio-3001, at ¶ 16 (10th Dist.). Generally, this court has applied harmless error review to the use of physical restraints on a criminal defendant during trial. *Id.*, citing *Chester* at ¶ 17. Where there is no timely objection, however, we review the improper use of shackles for plain error. *Id.* *See also Neyland* at ¶ 99; *State v. Froman*, 2020-Ohio-4523, ¶ 75. To demonstrate plain error under Crim.R. 52(B), a defendant "must show that an error occurred, that the error was plain, and that the error affected his substantial rights." *State v. Bond*, 2022-Ohio-4150, ¶ 17, citing *State v. Wilks*, 2018-Ohio-1562, ¶ 52. In describing the plain error standard, the Supreme Court has noted that "[e]ven if the error is obvious, it must have affected substantial rights," meaning " 'the trial court's error must have affected the outcome of the trial.' " *State v. Thomas*, 2017-Ohio-8011, ¶ 33, quoting *State v. Barnes*, 2002-Ohio-68, ¶ 20. The court clarified "that the accused is 'required to demonstrate a reasonable *probability* that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims.' " (Emphasis in

original.)   *Id.*, quoting *State v. Rogers*, 2015-Ohio-2459, ¶ 22, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004).   Reversal under plain error is warranted only "to correct a manifest miscarriage of justice." *State v. Buttery*, 2020-Ohio-2998, ¶ 7, citing *State v. Quarterman*, 2014-Ohio-4034, ¶ 16.

{¶ 48} Mr. Robertson concedes his trial counsel did not object to the trial court's decision to shackle him for trial and, thus, has waived all but plain error. (Appellant's Brief at 20.)   The state argues we need not apply even plain error review because the use of leg irons in this case was invited error.   "Under the invited-error doctrine, '[a] party will not be permitted to take advantage of an error which he himself invited or induced.' " *State v. Bey*, 1999-Ohio-283, ¶ 16, quoting *Hal Artz Lincoln-Mercury, Inc. v. Ford Motor Co., Lincoln-Mercury Div.*, 28 Ohio St.3d 20 (1986), paragraph one of the syllabus.   When an error is invited, an appellate court will not review the claimed error even for plain error.   *State v. Foster*, 2024-Ohio-2924, ¶ 53 (10th Dist.), citing *State v. Bogovich*, 2008-Ohio-3100, ¶ 10 (10th Dist.).   An error is invited " 'when a party has asked the court to take some action later claimed to be erroneous, *or affirmatively consented to a procedure the trial judge proposed.*' " (Emphasis added.) *State v. Garrett*, 2022-Ohio-4218, ¶ 203, quoting *State v. Campbell*, 2000-Ohio-183, ¶ 27.   However, a mere failure to object does not constitute invited error.   *Id.*

{¶ 49} The state points to the quoted exchange above as demonstrating defense counsel agreed to Mr. Robertson's appearance before the jury in leg irons.   Having reviewed the relevant portion of the transcript, we do not agree.   Specifically, the trial court stated to the jury that Mr. Robertson was wearing leg irons because he could not post bail and told the jury not to consider Mr. Robertson's pretrial incarceration for any purpose.   The court then directly asked defense counsel whether he was "in agreement with that instruction," and defense counsel answered affirmatively. (Tr. Vol. 3 at 571.)   Critically, the court asked only whether defense counsel agreed with the ***instruction to the jury*** not to consider Mr. Robertson's pretrial incarceration.   The court did not ask defense counsel whether he agreed with the court's ***decision*** to shackle Mr. Robertson for trial and allow the leg irons to be visible to the jury.   Thus, from this record, we do not agree with the state that the doctrine of invited error precludes our review of the trial court's decision to shackle Mr. Robertson for trial.   Accordingly, we will review the court's decision to shackle

Mr. Robertson and to allow the jury to view those shackles for plain error. *Neyland*, 2014-Ohio-1914, at ¶ 99; *Froman*, 2020-Ohio-4523, at ¶ 75.

{¶ 50} When an appellate court reviews a trial court's unsupported decision to shackle a defendant for trial, a key consideration is whether the shackles were visible to the jury. *See Neyland* at ¶ 102 (no plain error allowing the defendant to appear in leg restraints because "the leg restraints were under [the defendant's] pants and not visible to the jury"); *Hughes*, 2015-Ohio-151, at ¶ 25 (10th Dist.) (requiring the defendant to wear leg irons was harmless error where "nothing in the record indicates the jury ever saw [the] appellant wearing the leg irons" and "there is nothing in the transcript suggesting the jury knew [the] appellant was wearing leg irons"); *Chester*, 2008-Ohio-6679, at ¶ 12 (10th Dist.) (though trial court failed to exercise its own discretion before ordering leg shackles, the shackling was harmless error because "there is no evidence that the jury ever saw [the] appellant wearing the shackles" and the transcript "is devoid of any reference that would indicate the jury knew [the] appellant was wearing shackles"); *Froman* at ¶ 73 (a claim of a due process violation based on shackling "rises or falls on the question of whether the [restraining device] was visible to the jury") (internal quotations omitted); *State v. Myers*, 2018-Ohio-1903, ¶ 45 (rejecting the defendant's due process claim related to shackles because "[t]here is nothing in the record to indicate that the jury saw the shackles"). Here, the record demonstrates the jury saw Mr. Robertson wearing leg irons during trial. Indeed, the trial court expressly called the jury's attention to the restraints. The court instructed the jury not to consider Mr. Robertson's pretrial incarceration but gave no similar instruction to disregard Mr. Robertson's leg irons.

{¶ 51} As this court has previously noted, "[s]hackling a defendant in plain view of the jury has been considered 'inherently prejudicial.' " *Black*, 2017-Ohio-3001, at ¶ 8 (10th Dist.), quoting *State v. Irwin*, 2009-Ohio-5271, ¶ 235 (7th Dist.). " '[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove "beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained." ' " *Black* at ¶ 8, quoting *Deck*, 544 U.S. at 635, quoting *Chapman v. California*, 386 U.S. 18, 24 (1967).

{¶ 52} Under plain error review, the defendant bears the burden of identifying the existence of a plain error. *Bond*, 2022-Ohio-4150, at ¶ 7, citing *State v. Jones*, 2020-Ohio-3051, ¶ 17-18; *Black* at ¶ 18, citing *State v. Perry*, 2004-Ohio-297, ¶ 14. We find Mr. Robertson has met that burden here. The trial court ordered Mr. Robertson shackled for trial without any justification apparent in the record, and those shackles were visible to the jury at a critical moment: just before Mr. Robertson testified in his own defense to assert he acted in duress.

{¶ 53} Under plain error review, a defendant also bears the burden of demonstrating the plain error affected his substantial rights. *Perry* at ¶ 14. On appellate review, "both the nature of the error and the prejudice to defendant (the measure of how the error affected the verdict) are important." *State v. Morris*, 2014-Ohio-5052, ¶ 33. This principle is apparent, for example, when a court applies plain error review to what has been deemed a structural error. *See*, *e.g.*, *Bond* at ¶ 33 ("a defendant may show that a structural error to which he has failed to object at trial may have affected substantial rights for the purposes of a plain-error analysis, even if the defendant cannot show that but for the error, the outcome of the trial would have been different"). And although the Supreme Court of the United States did not classify the erroneous use of visible shackles as structural error in *Deck*, it reiterated how difficult it is to measure the harm caused by visible shackles. *Deck* at 635, quoting *Riggins v. Nevada*, 504 U.S. 127, 137 (1992) (the practice of using visible shackles "will often have negative effects, but . . . those effects 'cannot be shown from a trial transcript' "). Given *Deck's* acknowledgement, our review for prejudice under the plain error standard here must account for the inherently prejudicial and sometimes unquantifiable nature of the harm associated with the erroneous use of visible shackles. *See Bond* at ¶ 25, quoting *Barnes*, 2002-Ohio-68, at ¶ 20 ("[A]lthough we have held that an error can be shown to have affected substantial rights by showing that the error 'affected the outcome of the trial,' . . . that particular language does not appear in the rule itself"); *Black*, 2017-Ohio-3001, at ¶ 8 (10th Dist.), quoting *Deck* at 635; *Morris* at ¶ 33.

{¶ 54} The parties agree the sole contested issue at trial was Mr. Robertson's duress defense. Duress is an affirmative defense. *State v. Thompson*, 2009-Ohio-3552, ¶ 26 (10th Dist.), citing *State v. Getsy*, 84 Ohio St.3d 180, 198 (1998). A defendant must prove an affirmative defense by a preponderance of the evidence. *State v. Diggs*, 2014-Ohio-3340,

¶ 38 (10th Dist.). " ' "Duress consists of any conduct which overpowers a person's will and coerces or constrains his performance of an act which he otherwise would not have performed." ' " *Id.*, quoting *Thompson* at ¶ 28, quoting *State v. Grinnell*, 112 Ohio App.3d 124, 144-45 (10th Dist. 1996). " ' "Consequently, one who, under the pressure of a threat from another person, commits what would otherwise be a crime may, under certain circumstances, be justified in committing the act and not be guilty of the crime." ' " *Id.*, quoting *Thompson* at ¶ 28, quoting *Grinnell* at 145. "The defense of duress requires the defendant to prove a sense of immediate, imminent death or serious bodily injury if he does not commit the act as instructed." *Id.*, citing *State v. Cross*, 58 Ohio St.2d 482, 487 (1979). Additionally, "[t]he force used to compel the defendant's conduct must remain constant, controlling the will of the otherwise unwilling actor during the entire time he commits the act, and must be of such a nature that the [actor] cannot safely withdraw." *Id.*, citing *State v. Good*, 110 Ohio App. 415, 419 (10th Dist. 1960).

{¶ 55} To successfully assert a duress defense, a defendant must have a subjective belief that he is in danger of imminent death or grave bodily injury, and that subjective belief must be objectively reasonable based upon the evidence presented. *Thompson* at ¶ 29-30, quoting *Tallmadge v. Robinson*, 158 Ohio St. 333 (1952), paragraph two of the syllabus ("In determining whether a course of conduct results in duress, the question is not what effect such conduct would have upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered.").

{¶ 56} On appeal, the state argues there was no prejudice from the trial court's use of shackles because the evidence was insufficient to support a duress defense. While that may be the state's argument on appeal, at trial, the state affirmatively declared it was "not going to oppose" the defense's request for a duress instruction. (Tr. Vol. 3 at 570.) The trial court made "sure" the state was agreeing to the instruction, and the state reiterated it did not oppose the instruction. (Tr. Vol. 3 at 570.) As a result, the court provided the duress instruction to the jury **with agreement** from the state. *See Thompson* at ¶ 31, quoting *Cross* at 488 (though the defense of duress is applicable on rare occasions, " '[a]ll the conditions must be met, and the court must find as a matter of law that the evidence is

sufficient to warrant [a duress] instruction' "). At trial, Mr. Robertson repeatedly testified he was afraid of what Mr. Adams would do to him if he did not go along with the group. (Tr. Vol. 3 at 584-87, 590, 594-96, 610-11.) He explained that his history with Mr. Adams and his knowledge of Mr. Adams' violent tendencies caused him to genuinely believe Mr. Adams would shoot him for not cooperating. (Tr. Vol. 3 at 574, 579-80, 586, 596, 611, 614, 626.) Mr. Adams testified he forced Mr. Robertson to return to the scene of the robbery despite Mr. Robertson maintaining the entire time he did not want to be there. (Tr. Vol. 3 at 510, 518-19, 525.) All four men testified Mr. Adams was angry when he ordered Mr. Robertson to get back in the car and accompany him to the scene of the robbery. (Tr. Vol. 2 and 3 at 231, 236-37, 260, 277, 355-57, 518-19, 586.) All four men also testified Mr. Adams was armed, and Mr. Robertson testified Mr. Adams had multiple firearms with him when he ordered Mr. Robertson back in the car. (Tr. Vol. 2 and 3 at 236-37, 357, 518-19, 586.)

{¶ 57} The state notes in its brief to this court that "the bulk of the facts in the case" were provided by the testimony of Mr. Jennings, Mr. Colvin, Mr. Adams, and Mr. Robertson. (State's Brief at 2.) This admission from the state highlights that the jury's credibility evaluations of the four individuals with admitted involvement in the incident were pivotal to the jury's factfinding. Critically, since a claim of duress requires a subjective belief that the actor was in danger of imminent death or grave bodily injury, the jury's determination of Mr. Robertson's credibility on his claim that he acted under duress is directly related to the jury's ultimate verdict. And the record demonstrates the jury was struggling with this issue, given its question regarding unanimity during deliberations.

{¶ 58} It is difficult to measure the degree to which the jury was influenced by Mr. Robertson's visible leg irons. *See Deck* at 635. We do know from the record, however, that the jury watched Mr. Robertson walk in his leg irons from his seat at the defense table to the witness stand. The jury's view of Mr. Robertson's shackles, therefore, was neither brief nor inadvertent, and it occurred in the courtroom, during trial, and just prior to Mr. Robertson's testimony. *Compare Black*, 2017-Ohio-3001, at ¶ 19 (10th Dist.) (defendant could not demonstrate prejudice on plain error review from the use of visible shackles during voir dire where not all of the jury saw the shackles and "the record d[id] not reflect the duration and particular circumstances of that sighting"); *State v. McKnight*,

2005-Ohio-6046, ¶ 219 (though the appellant was not shackled during the trial, he was placed in handcuffs while jurors were leaving the courtroom; however, the appellant could not demonstrate prejudice because "[t]he jury's view of him [in handcuffs] was brief and inadvertent"); *State v. Jalowiec*, 2001-Ohio-26, ¶ 29 (the appellant could not show prejudice from visible shackles where several potential jurors saw the appellant in handcuffs in the hallway prior to voir dire because it was "brief, inadvertent, and outside the courtroom"); *State v. Nields*, 2001-Ohio-1291, ¶ 143 (the defendant could not demonstrate prejudice from several jurors' "brief, inadvertent, and outside the courtroom" sighting of the defendant in shackles when the jurors were on their lunch break).

{¶ 59} Because the jury's determination of Mr. Robertson's credibility was so crucial to his affirmative defense, and in light of the inherent prejudice associated with visible shackles and the specific circumstances of the shackling in this case, *see Deck* at 635, we find Mr. Robertson has demonstrated a reasonable probability that the shackles contributed to the jury's evaluation of his believability and, thus, affected the outcome of the trial. *See State v. Pruett*, 2015-Ohio-1377, ¶ 20 (8th Dist.) (where credibility determinations are central to the case, improperly undermining a witness's credibility infringes upon the role of the jury to determine the veracity and credibility of witnesses and can constitute prejudice under ineffective assistance of counsel review), quoting *State v. Dzelajlija*, 2007-Ohio-4050, ¶ 39 (8th Dist.), quoting *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988).

{¶ 60} We are mindful that "correcting a plain error may be done only in 'exceptional circumstances and only to prevent a manifest miscarriage of justice.' " *Bond*, 2022-Ohio-4150, at ¶ 18, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus. *See also United States v. Olano*, 507 U.S. 725, 736 (1993), quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936). Given the confluence of the unique facts of this case—requiring Mr. Robertson to appear before the jury in visible shackles without adequate justification, explicitly calling the jury's attention to the leg irons, the duress defense being the sole contested issue at trial, the state agreeing to the trial court giving the duress instruction, the court concluding the elements were sufficiently met to warrant the instruction, the jury demonstrating it was grappling with the duress defense, and the inextricable link between all of these factors and Mr. Robertson's credibility in the eyes of

the jury—we find this case to be the exceptional circumstance that requires correction of a manifest miscarriage of justice. *Compare McKnight* at ¶ 220 (even though the jury saw the defendant handcuffed on one occasion as jurors were leaving the courtroom, it was brief and inadvertent, and "the trial court's curative instruction removed any prejudice"), and *United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1975) ("[i]n view of the remedial actions taken by the District Judge and the nature of the brief encounter with the jurors . . . the record shows no prejudice depriving [the] defendant of a fair trial"). Any one of these factors, on their own, may not rise to the level of prejudice necessary for plain error. Viewed cumulatively, however, these facts illustrate the type of inherent prejudice *Deck* cautions against, prejudice that seriously affected the fairness and integrity of Mr. Robertson's trial. We conclude, therefore, that the use of visible shackles without adequate justification was plain error and violated Mr. Robertson's due process right to a fair trial.[2] Accordingly, we sustain Mr. Robertson's first assignment of error as it relates to his convictions of aggravated robbery, improperly discharging a firearm at or into a habitation, felonious assault, aggravated murder, and felony murder. Because the trial court instructed the jury that the duress defense did not apply to Count 7, purposeful murder, and because Mr. Robertson does not assign any error on appeal to the substance or scope of that instruction, our finding of plain error does not affect Mr. Robertson's murder conviction under Count 7.[3]

---

[2] This decision should not be construed as suggesting that every trial court error in ordering the use of visible shackles without adequate justification constitutes reversible plain error. This decision is limited to the unique facts of this case, and we exercise our discretion to recognize the plain error here because we find these specific facts resulted in a manifest miscarriage of justice undermining the basic fairness and integrity of Mr. Robertson's trial.

[3] The record reflects defense counsel and the state were "in agreement" that duress did not apply to Count 7. (Tr. at 569.) Because trial counsel agreed to the instruction, any potential error in the trial court's instruction that duress did not apply to Count 7 would be invited error. *Foster*, 2024-Ohio-2924, at ¶ 53. Additionally, because appellate counsel did not raise trial counsel's agreement to the scope of the duress instruction as a basis for finding trial counsel ineffective, the propriety of that instruction is not before us at this juncture. *See Getsy*, 1998-Ohio-533, at ¶ 111 (holding "duress cannot be asserted as a defense to aggravated murder under R.C. 2903.01(A)" committed with prior calculation and design, but declining to address whether duress is an available defense to felony murder); *Grinnell*, 112 Ohio App.3d at 144 (10th Dist. 1996), quoting *State v. Woods*, 48 Ohio St.2d 127, 135, fn. 3 (1976) (the question of whether duress is a defense to murder " 'has not been decided in Ohio' ").

## IV. Second, Third, Fourth, Fifth, and Sixth Assignments of Error

{¶ 61} In his second assignment of error, Mr. Robertson argues the trial court plainly erred with respect to certain evidentiary admissions. In his third assignment of error, Mr. Robertson asserts the prosecutor engaged in prosecutorial misconduct that was not harmless error by playing a recorded phone conversation between defense counsel and Mr. Adams. In his fourth assignment of error, Mr. Robertson argues the trial court plainly erred by inquiring into the status of the jury's deliberations. In his fifth assignment of error, Mr. Robertson argues his convictions were based on insufficient evidence and against the manifest weight of the evidence. And in his sixth assignment of error, Mr. Robertson argues he received the ineffective assistance of trial counsel.

{¶ 62} Because our resolution of Mr. Robertson's first assignment of error requires reversal of the trial court's judgment related to his convictions for aggravated robbery, improperly discharging a firearm at or into a habitation, felonious assault, aggravated murder, and felony murder, Mr. Robertson's second, third, fourth, fifth, and sixth assignments of error are moot as to those convictions. *See* App.R. 12(A)(1)(c); *State v. Gideon*, 2020-Ohio-6961, ¶ 26 ("An assignment of error is moot when an appellant presents issues that are no longer live as a result of some other decision rendered by the appellate court."). However, our resolution of Mr. Robertson's first assignment of error does not require reversal of Mr. Robertson's murder conviction under Count 7, so his second, third, fourth, fifth, and sixth assignments of error are not moot with respect to Count 7. Nevertheless, we conclude those assignments of error lack merit as to Count 7.

{¶ 63} Both at trial and on appeal, Mr. Robertson admitted he committed the charged offenses but asserted he acted under duress. *See State v. Poole*, 33 Ohio St.2d 18, 19 (1973) (an affirmative defense is not a "denial or contradiction" of the essential elements of the crime charged but is a justification that exempts a defendant from liability); *State v. Wilson*, 2024-Ohio-776, ¶ 22 (noting an affirmative defense "must be a 'true' defense—a justification for the conduct—not a negation of the elements of the underlying charge"). The arguments Mr. Robertson advances under his second, third, fourth, fifth, and sixth assignments of error relate to his affirmative defense of duress, and appellate counsel conceded at oral argument that duress was the sole issue on appeal. The trial court instructed the jury that duress was not a defense to Count 7, and Mr. Robertson does not

assign any error related to that instruction. Additionally, whether we are reviewing for harmless error (assignment of error three), plain error (assignments of error two, four, and five), or ineffective assistance of counsel (assignment of error six), Mr. Robertson does not articulate any prejudice from these alleged errors related to his murder conviction under Count 7. *See Morris*, 2014-Ohio-5052, at ¶ 29, quoting *State v. Rahman*, 23 Ohio St.3d 146, 151 (1986), quoting *State v. Ferguson*, 5 Ohio St.3d 160, 166, fn. 5 (1983) (" ' "the cases where imposition of harmless error is appropriate must involve either overwhelming evidence of guilt or some other indicia that the error did not contribute to the conviction" ' "); *Rogers*, 2015-Ohio-2459, at ¶ 22 (emphasis in original) (under both plain error and ineffective assistance of counsel, the defendant is "required to demonstrate a reasonable *probability* that the error resulted in prejudice"); *Strickland v. Washington*, 466 U.S. 668, 694 (1984) ("A reasonable probability is a probability sufficient to undermine confidence in the outcome"). Given Mr. Robertson's admission that he committed the charged offenses, the trial court's instruction that duress did not apply to Count 7, and appellate counsel's concession that duress is the sole issue on appeal, we overrule the portions of Mr. Robertson's second, third, fourth, fifth, and sixth assignments of error that relate to his murder conviction under Count 7 because Mr. Roberston is unable to demonstrate prejudice under plain error review, harmless error review, or *Strickland* as to that count.

## V. Supplemental Assignment of Error

{¶ 64} In his supplemental assignment of error, Mr. Robertson argues the trial court erred in imposing his sentence. Because we have determined we must reverse Mr. Robertson's convictions for aggravated robbery, improperly discharging a firearm at or into a habitation, felonious assault, aggravated murder, and felony murder and remand the matter to the trial court for further proceedings, and the alleged sentencing error related to the imposition of sentences on multiple offenses, the supplemental assignment of error is moot, and we decline to address it. App.R. 12(A)(1)(c); *Gideon* at ¶ 26.

## VI. Disposition

{¶ 65} Based on the foregoing reasons, we find the trial court committed plain error in requiring Mr. Robertson to appear in visible shackles in front of the jury without adequate justification. We find this is the exceptional circumstance requiring correction of

plain error to prevent a manifest miscarriage of justice, and we sustain Mr. Robertson's first assignment of error. The portions of Mr. Robertson's second, third, fourth, fifth, and sixth assignments of error related to his convictions for aggravated robbery, improperly discharging a firearm at or into a habitation, felonious assault, aggravated murder, and felony murder are rendered moot, and we overrule the remaining portions of those assignments of error related to his murder conviction under Count 7. Lastly, because we have determined we must reverse Mr. Robertson's convictions of aggravated robbery, improperly discharging a firearm at or into a habitation, felonious assault, aggravated murder, and felony murder and remand the matter to the trial court, Mr. Robertson's supplemental assignment of error related to sentencing errors is rendered moot. Accordingly, we affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas to the extent indicated, and we remand the matter to that court for further proceedings in accordance with law and consistent with this decision.

*Judgment affirmed in part and reversed in part*;
*cause remanded.*

BOGGS, P.J., and MENTEL, J., concur.

_____